**No. 25-11338 -TT**

# United States Court of Appeals

*for the*

# Eleventh Circuit

———— • ————

JUDSON PANKEY,

*Plaintiff-Appellant,*

– v. –

AETNA LIFE INSURANCE COMPANY,

*Defendant-Appellee.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA IN NO. 6:23-CV-01119-WWB-UAM
(HONORABLE WENDY W. BERGER)

## BRIEF FOR PLAINTIFF-APPELLANT

GREGORY DAVID SWARTWOOD
THE NATION LAW FIRM
*Attorneys for Plaintiff-Appellant*
570 Crown Oak Centre Drive
Longwood, Florida 32750
(407) 339-1104

CP COUNSEL PRESS   (800) 4-APPEAL • (813670)

Case No.: 25-11338-TT

Judson Pankey v. Aetna Life Insurance Company

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, Appellee, Judson Pankey, respectfully submits the following Certificate of Interested Persons and Corporate Disclosure Statement:

Aetna, Inc. (Stock Ticker: AET)

Aetna Life Insurance Company (Stock Ticker: none known)

Berger, Wendy W., United States District Court Judge

Fordin, Jonathan, M., Esq.

Hartford Life and Accident Insurance Company (Stock Ticker: HIG)

Jones, Amy Wessel, Esq.

Kidd, Embry, J., Untied Staes District Court Magistrate Judge

Pankey, Judson

Shutts & Bowen LLP

Swartwood, Gregory D., Esq.

The Nation Law Firm, LLP

C - 1 of 2

Case No.: 25-11338-TT

Judson Pankey v. Aetna Life Insurance Company

## CORPORATE DISCLOSURE STATEMENT

Judson Pankey, Appellant, need not make any corporate disclosures as he is not a corporation.

However, upon information and belief, Aetna Life Insurance Company (Stock Ticker: AET), Appellee, (or its parent company) is a publicly traded company or corporation and has an interest in the outcome of the case or appeal. Judson Pankey does not know Aetna Life Insurance Company's subsidiaries, conglomerates, affiliates, parent corporations, and/or any publicly held corporation(s) that own 10% or more of the Aetna Life Insurance Company's stock, and/or other identifiable legal entities related to Aetna Life Insurance Company. However, Aetna Life Insurance Company disclosed in the District Court the following entities:

Aetna, Inc.

Hartford Life and Accident Insurance Company – as an indemnity reinsurer of disability insurance issued by Aetna Life Insurance Company

C – 2 of 2

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant respectfully submits that oral argument would be helpful to the disposition of this appeal.  Oral argument would allow the parties to address any specific questions regarding the factual record before the district court and the legal issues presented on appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ..................................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................................i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES...........................................................................iv

STATEMENT OF JURISDICTION ........................................................... vii

STATEMENT OF THE ISSUE...........................................................................1

STATEMENT OF THE CASE...........................................................................1

    A.    COURSE OF PROCEEDINGS AND DISPOSITION IN THE COURT BELOW ...................................................................................1

    B.    STATEMENT OF FACTS...........................................................................2

        Applicable Policy Provisions ..................................................................13

    C.    STANDARD OF REVIEW ........................................................................16

SUMMARY OF THE ARGUMENT ........................................................................17

ARGUMENT ........................................................................................................18

    The District Court Erred In Concluding That Aetna's Termination Of Disability Benefits Was Not Wrong And Arbitrary And Capricious.............18

    A.    ERISA Standard of Review ................................................................18

    B.    The Decision Is Wrong And Arbitrary And Capricious ......................21

        Preliminary Matters..................................................................................21

ii

Pankey Provided The Information Requested By Aetna And/Or Aetna Has Not Shown That The LTD Plan Requires That Pankey Provide Tax Returns/K-1 Schedules From Brown Little Development ....................................................................................24

Aetna's Termination Of Disability Benefits Is Wrong And Arbitrary And Capricious Despite Pankey's Failure To Provide K-1 Schedules For Brown Little Development....................................34

    1) Past acceptance of K-1 schedules ..........................................37

    2) Pankey's past provision of K-1 schedules ..............................39

The District Court Erred In Rejecting The Finding In The R&R That Aetna's Decision Was Arbitrary And Capricious Because The Failure To Provide Tax Information Warranted Only A Suspension Of Pankey's Benefits Not A Termination Of Benefits ....... 40

CONCLUSION ......................................................................................47

CERTIFICATE OF COMPLIANCE .....................................................48

CERTIFICATE OF SERVICE ..............................................................49

iii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blankenship v. Metro. Life Ins. Co.*,
    644 F.3d 1350 (11th Cir. 2011) ......................................................19, 20

*Bryant v. Commuity Bankshares, Inc.*,
    265 F. Supp. 3d 1307 (M.D. Ala. 2017),
    *aff'd*, 736 F. App'x 841 (11th Cir. 2018) ..............................................32, 37, 38

*Cagle v. Bruner*,
    112 F.3d 1510 (11th Cir. 1997) .....................................................................31

*Cates v. Reliance Standard Insurance Company*,
    Civil Action File No. 1:18-cv-543-TCB,
    2019 WL 4751860 (N.D. Ga. July 2, 2019) .....................................28, 29, 30

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................16

*Clemons v. Dougherty County, Ga.*,
    684 F.2d 1365 (11th Cir. 1982) ....................................................................16

*Counts v. American General Life and Acc. Ins. Co.*,
    111 F.3d 105, 108 (11th Cir. 1997)...............................................................26

*Cromer–Tyler v. Teitel*,
    294 Fed. Appx. 504 (11th Cir. 2008) ............................................................27

*Dahl-Eimers v. Mutual of Omaha Life Ins. Co.*,
    986 F.2d 1379 (11th Cir. 1993) ....................................................................32

*Epolito v. Prudential Insurance Company of America*,
    737 F.Supp.2d 1364 (M.D. Fla. 2010) ..........................................................38

*Fireman's Fund Ins. Co. v. Tropical Shipping & Constr. Co.*,
    254 F.3d 987 (11th Cir. 2001) ......................................................................16

*Firestone Tire & Rubber Co. v. Bruch*,
    489 U.S. 101, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989) ..................................18

*Frye v. Thompson Steel Co., Inc.*,
    657 F.3d 488 (7th Cir. 2011) ...............................................................44

*Glenn v. MetLife*,
    461 F.3d, *aff'd Metropolitan Life Ins. Co. v. Glenn,* 554 U.S.
    105, 128 S. Ct. 2343, 171 L.Ed.2d 299 (2008) ..............................................20

*Jackson v. Fort Dearborn Life Insurance Company*,
    Civil Action No. 2:10cv60-MHT, 2010 WL 3880157
    (M.D. Ga. Sept. 28, 2010) ...............................................................26

*McDonald v. Western-Southern Life Ins. Co.*,
    347 F.3d 161 (6th Cir. 2003) ...............................................................20, 26

*Metro. Life Ins. Co. v. Glenn*,
    554 U.S. 105, 128 S. Ct. 2343, 171 L.Ed.2d 299 (2008) ..............................20

*Moon v. Unum Provident Corp.,*
    405 F.3d 373 (6th Cir. 2005) ...............................................................21

*Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*,
    No. 21-10242, 2022 WL 6635136 (11th Cir. Oct. 11, 2022) ......................43

*Reed v. Metropolitan Life Insurance Company*,
    944 F.Supp.2d 1279 (N.D. Ga. 2013)............................................................21

*S.-Owners Ins. Co. v. MAC Contractors of Fla., LLC*,
    No. 18-13040, 2019 WL 1567761 (11th Cir. Apr. 11, 2019) ......................16

*Smith v Bayer Corp. Long Term Disability Plan*,
    275 Fed.Appx. 495 (6th Cir.2008)............................................................20

*Tapley v. Locals 302 & 612 of the Int'l Union of Operating Eng'r–
Emp'rs Constr. Indus. Ret. Plan*,
    728 F.3d 1134 (9th Cir. 2013) ...............................................................32

*United States v. Pielago*,
    135 F.3d 703 (11th Cir. 1998)...............................................................46

*Warrior Tombigbee Tramp. Co. v. M/V Nan Fung*,
    695 F.2d 1294 (11th Cir. 1983)...............................................................16

v

*White v. Coca-Cola Co.*,
542 F.3d 848 (11th Cir. 2008) ...........................................................................31

*Zanny v. Kellogg Company*,
No. 4:05-CV-74, 2006 WL 1851236
(W.D. Mich. June 30, 2006) ...........................................................................30

**Statutes**

29 U.S.C. § 1132(a)(1)(B) ...........................................................................1, 18

Americans with Disabilities Act (ADA)...........................................................8

ERISA § 502, 29 U.S.C. § 1132 .....................................................................18

ERISA (1974) Title 1 § 503............................................................................20

Health Insurance Portability and Accountability Act......................................8

**Rules and Regulations**

11th Cir. R. 28-5 .............................................................................................2

29 C.F.R. § 2560.503-1(g)(1)(i)..................................................................24, 39

29 C.F.R. § 2560.503-1(g)(1)(ii) .................................................................24, 46

29 C.F.R. § 2560.503-1(g)(1)(vii)(C) ...............................................................24

Dictionary of Occupational Titles......................................................................3

Fed. R. Civ. P. 56 .............................................................................................16

**Other Authorities**

Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/work (last visited August 26, 2025)........................32

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because this is a direct appeal from a final order and judgment granting Aetna Life Insurance Company's ("Aetna") motion for summary judgment in a civil proceeding in the United States District Court for the Middle District of Florida, Orlando Division. (Doc 33, 34; A3596, A3609.)[1]  the final order and judgment disposed of all of the parties' claims.

The district court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the civil action arises under the Constitution, laws, or treaties of the United States. Specifically, it is an action for relief under the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. §§ 1001, et seq. (Doc 1 at 1; A6.) The final order and judgment appealed from were entered March 28, 2025 (Doc 33, 34; A3596, A3609.)  Appellant Judson Pankey ("Pankey") timely filed his notice of appeal on April 21, 2025. (Doc 36; A3611.)

---

[1]  References to Docket Entries are abbreviated as "Doc ___". References to the Appendix are abbreviated as "A__.".

**STATEMENT OF THE ISSUE**

Did the district court err in granting Aetna's motion for summary judgment, concluding, under the arbitrary and capacious standard of review, that Judson Pankey's ("Pankey") claim for disability benefits was appropriately terminated because of his failure to provide certain tax or other financial documents?

**STATEMENT OF THE CASE**

**A. COURSE OF PROCEEDINGS AND DISPOSITION IN THE COURT BELOW**

On June 14, 2023, Pankey filed an action for ERISA Plan benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).  (Doc 1; A6.)

On April 4, 2024, Pankey moved for summary judgment.  (Doc 22; A3454.) On April 5, 2024 Aetna moved for summary judgment (Doc 24; A3479.)  On May 2, 2024, Pankey filed a response Aetna's motion for summary judgment.  (Doc 25; A3503.)  On May 6, 2024, Aetna filed a response Pankey's motion for summary judgment.  (Doc 26; A3523.)  On May 20, 2024, Pankey filed a reply to Aetna's response to the Pankey motion for summary judgment.  (Doc 27; A3543.)  On June 4, 2024 Aetna filed a reply to Pankey's response to the Aetna motion for summary judgment.  (Doc 28; A3550.)

On December 27, 2024, United States Magistrate Judge Embry J. Kidd entered a Report and Recommendation (R&R") recommending that Pankey's motion for summary judgment be granted and that Aetna's motion for summary

1

judgment be denied.  (Doc 29; A3557.)  Aetna filed its objection to the R&R on January 9, 2025.  (Doc 31; A3576.)  On January 22, 2025, Pankey filed a response Aetna's objection to the R&R.  (Doc 32; A3586.)  On March 28, 2025, the district court rejected in material part the R&R and granted Aetna's motion for summary judgment and denied Pankey's motion for summary judgment.  (Doc 33; A3596.)

The district court entered judgment on March 28, 2025.  (Doc 34; A3609.) Pankey filed a notice of appeal on April 21, 2025.  (Doc 36; A3611.)

## B. STATEMENT OF FACTS

Pankey seeks continued long term disability ("LTD") benefits.  (Doc 1 at 3 (¶¶12-17); A8.)    Pankey was an employee of CPH Engineers, Inc. ("CPH"). Administrative Record at 1. (Doc 21; A23.)[2]  Pankey was a professional engineer

---

[2]  A copy of the Administrative Record, including the applicable Plan documents, was filed by the Aetna on January 12, 2024.  (Doc 21-1 and 21-2; A21.)  Those documents are Bates stamped A000001 – A003431.   The applicable Plan documents are included in the record at A003375-A003431.  The applicable Plan document will be referred to as the "LTD Plan."  Hereinafter, the Administrative Record and LTD Plan document will be identified by the stamped page numbers as "AR[page number]."

As noted, the Administrative Record was filed in two parts – Doc 21–1 and 21–2 although it is sequential numbered via stamped numbers throughout the entire document.  The undersigned is using the stamped page numbers rather than the page numbers in the header of the two different parts since the page numbers in the header will be duplicative and likely confusing.  11th Cir. R. 28-5 indicates that the header page number should be used in a transcript, but that rule does not detail how to identify pages of a two-part Administrative Record as here.  Referring to the sequential stamped page numbers appears to provide the most easily accessible pinpoint citations for the Court.

2

and was employed by CPH as a Senior Vice President and Senior Project Manager. (Doc 21-1 and 21-2, AR69-70, 1904; A91-92, 1926).  Aetna determined that his job was sedentary as that term is defined by the Dictionary of Occupational Titles ("DOT").  (Doc 21-1, AR70; A92.) However, it also determined that his job required that he talk and hear on a frequent basis.  (Doc 21-1, AR70; A92.)

Pankey applied for benefits on or about November 10, 2011.  (Doc 21-1, AR517; A539.)  Pankey's initial claim documents are included in the Administrative Record at 1904-1926.  (Doc 21-2, AR1904-1926; A1926-1948.)  An Attending Physician Statement ("APS") and a Capacities and Limitations Worksheet ("CLW") were completed by his attending healthcare provider in support of his claim.  (Doc 21-2, AR1921-1925; A1943-1947.)  These forms were completed by Lisa Spiegel, AUD.  *Id*.  She provided the results of hearing test showing that he had "severe to profound sensorineural hearing loss, bilaterally, poor speech discrimination ability, bilaterally."  (Doc 21-2, AR1926; A1948.)  His employer advised that he was unable to perform his job because he could not communicate effectively.  (Doc 21-2, AR1904; A1926.)

Via letter dated December 23, 2011, Pankey's claim for LTD benefits was approved.  (Doc 21-1, AR522-526; A544-548.)

Shortly thereafter, Pankey was approved for disability benefits from the Social Security Administration ("SSA") on February 25, 2012.  (Doc 21-1, AR1230-1233;

3

A1252-1255.)  He also received SSA disability benefits for his dependents.  (Doc 21-1, AR1372-1373; A1394-1395.)  SSA disability benefits became payable May of 2012, after Pankey exhausted the SSA's five-month waiting period.  (Doc 21-1, AR1230; A1252.)  The LTD Plan allows Aetna to offset, against the LTD benefit, amounts received by an insured from various sources.  (Doc 21-2, AR3410-3411; A3432-3433.)  This includes SSA disability benefits.  (Doc 21-2, AR3410; A3432.)  Via letter dated June 14, 2012, Aetna advised Pankey that it was offsetting his SSA disability benefits from the LTD Plan benefits.  (Doc 21-1, AR526-527; A548-549.)

The LTD Plan definition of disability allows a claimant to receive LTD benefits, for the first 24 months, if the claimant is unable to perform the material duties of his own occupation.  (Doc 21-2, AR3407; A3429.)  Thereafter, LTD benefits will be continued only if the claimant is unable to perform "any **reasonable occupation** solely because of an **illness**, **injury** or disabling pregnancy-related condition."  *Id*.  The LTD Plan defines reasonable occupation as "gainful activity" for which "you are, or may reasonably become, fitted by education, training, or experience, and [w]hich results in, or can be expected to result in, an income of more than 60% of your **adjusted predisability earnings**."  (Doc 21-2, AR3424; A3446.)  Accordingly, via letter dated May 4, 2013, Aetna advised Pankey that it would be reviewing his claim to determine whether he was entitled to continued benefits following the change in definition ("CID").  (Doc 21-1, AR530-540; A552-562.)

The CID was set to occur on or about December 26, 2013. (Doc 21-1, AR530; A552.)

Via letter dated January 3, 2014, Aetna terminated Pankey's benefits finding that he was not disabled from any reasonable occupation. (Doc 21-1, AR1503, 1506-1511; A1525, 1528-1533.)  Pankey appealed the decision via letter dated April 3, 2014.  (Doc 21-1, AR1525-1552; A1547-1574.)  Via letter dated July 31, 2014, Aetna overturned its decision, finding that Pankey was disabled not only from his own occupation but also from any reasonable occupation.  (Doc 21-1, AR553; A575.)  However, the July 31, 2014, letter advised that benefits would not be disbursed until Aetna received "copies of your tax returns from September 26, 2011 to present. . . ." *Id.*

Aetna first requested tax returns from September 26, 2011 to present via letter dated July 1, 2014.  (Doc 21-1, AR553-554; A575-576.)  Pankey responded via letter dated July 21, 2014, essentially asking why Aetna was requesting several years of past tax returns when it was in the process of determining whether Pankey remained medically disabled. (Doc 21-2, AR2797-2798; A2819-2820.)  Aetna again requested tax returns via letter dated August 8, 2014.  (Doc 21-1, AR554; A576.)  Again, Pankey responded via letter dated August 22, 2014, advising that he provided appropriate information regarding his lack of earnings from any other source.  (Doc 21-2, AR2795-2796; A2817-2818.)  Again, Aetna requested tax returns via letter

5

dated October 27, 2014. (Doc 21-1, AR554-555; A576-577.) Pankey responded to this request via letter dated November 14, 2014. (Doc 21-2, AR2768; A2790.) In that letter, he specifically noted that: "Claimant inquired with Aetna in letters dated July 21, 2014 and August 22, 2014 what specific financial information it was looking for and the policy/plan provision that related to Aetna's concern. Aetna has not responded to Claimant's inquiries." *Id.* Also, Pankey requested that Aetna provide him with written confirmation that it would protect the confidentiality of his joint tax return (which included his wife). *Id.* He was especially concerned with confidentiality given the fact that his spouse's identity had recently been fraudulently used. *Id.*

Via letter dated December 1, 2014, Aetna acknowledged Pankey's November 14, 2014 letter and provided a specific address where Pankey could provide his tax returns. (Doc 21-1, AR555; A577.) Pankey responded to this letter via letter dated December 15, 2014. (Doc 21-2, AR2598; A2620.) He requested again that Aetna provide him with written confirmation that it would protect the confidentiality of his joint tax return. *Id.* Aetna followed up with a letter dated December 18, 2014 again requesting tax returns, providing two addresses where such returns could be provided as well as a confidential fax number. (Doc 21-1, AR555-556; A577-578.) Pankey responded via letter dated January 15, 2015 requesting, upon other things, assurances

6

of confidentiality with respect to his tax returns.  (Doc 21-2, AR2595-2596; A2617-2618.)

Via letter dated February 24, 2015, Aetna finally explained that its concern regarding work earnings centered around a business entity called "Brown Little Development."  (Doc 21-1, AR556-558; A578-580.)  Aetna conceded that even if it was entitled to an offset for work earnings, Pankey would still be entitled to the minimum benefit[3].  (Doc 21-1, AR557; A.579)  Accordingly, it released to him the minimum monthly benefit for the past due months.  *Id*.  Pankey responded to this letter via letter dated March 16, 2015.  (Doc 21-2, AR2814-2815; A2836-2837.)  In that letter, Pankey explained that Brown Little Development was a passive real estate investment and that it had reported a loss for the years 2011, 2012, 2013 and 2014. (Doc 21-2, AR2815; A2837.)

Via letter dated April 27, 2015, Aetna requested tax returns from 2011 to 2014.  (Doc 21-1, AR558-559; A580-581.)  Aetna requested the same information via letter dated May 15, 2015.  (Doc 21-1, AR559-560; A581-582.)  Pankey, in a

---

[3]  The LTD Plan allows offsets for Other Income Benefits from the monthly LTD benefit however, "[i]f the result is less than the minimum monthly benefit shown in the *Schedule of Benefits*, [10% of the gross benefit] the plan will pay an amount equal to the minimum monthly benefit."  Doc 21-2, AR3407,  3398: A3429, 3420. As noted below, any work earnings he would have would not be Other Income Benefits, and his passive real estate income would not be work earnings.  But, while investigating these issues, Aetna should have at least paid him the minimum benefit.

letter dated June 15, 2015, requested a copy of his claim file.  (Doc 21-2, AR2829; A.2851)  In a letter dated June 22, 2015, Aetna again terminated Pankey's benefits.  (Doc 21-1, AR561-563; A583-585.)  Benefits were terminated at this time based on his failure to provide proof of loss, specifically tax returns.  *Id*.  Pankey appealed this decision via letter dated December 28, 2015.  (Doc 21-1, AR974-985; A996-1007.)  As part of this appeal, Pankey did not provide his personal joint tax returns because of Aetna's refusal to assure that confidentiality would be maintained but did provide tax returns for Brown Little Development from 2011-2014.  (Doc 21-1 and 21-2, AR982-983, 3085-3107; A.1004-1005, 3107-3129.)  Benefits were reinstated via letter dated January 14, 2016.  (Doc 21-1, AR570; A592)

Pankey filed an Americans with Disabilities Act ("ADA") claim against Aetna on or about November 13, 2012.  (Doc 21-2, AR2650; A2672.)  He alleged that it failed to provide CART [Communication Access Real Time] services, which is a real time transcription service for the deaf when using a telephone.  *Id*.  He amended that claim on February 27, 2014.  (Doc 21-2, AR2650-2652; A2672-2674.)  Pankey also filed a complaint with the Department of Health and Human Services regarding an alleged HIPPA [Health Insurance Portability and Accountability Act] violation against Aetna.  (Doc 21-2, AR3036-3038; A3058-3060.)  Pankey via letter dated March 20, 2015, contacted Senators Lamar Alexander and Patty Murray regarding the alleged failure of Aetna to provide CART services.  (Doc 21-2, AR3027-3029;

8

A3049-3051.)  The U.S. Department of Justice responded via letter dated July 7, 2015, offering mediation.  (Doc 21-2, AR73033-3035; A3055-3057.)  He also contacted Senator William Nelson on September 14, 2015.  (Doc 21-2, AR2655-2656; A2677-2678.)  Pankey contacted the U.S. Department of Labor regarding an alleged ERISA violation for terminating his disability payments for failure to provide tax returns.  (Doc 21-2, AR2630; A2652.)  The U.S. Department of Labor responded via letter dated July 13, 2015.  (Doc 21-2, AR3032; A3054.)  On or about June 10, 2016, Pankey filed a pro se complaint against Aetna and others for violating the ADA.  (Doc 21-1, AR1006-1021; A1028-1043.)

Aetna requested tax returns for 2015 via letter dated April 6, 2016 (Doc 21-1, AR572-575; A594-597), May 6, 2016 (Doc 21-1, AR576-579; A598-601) and June 20, 2016 (Doc 21-1, AR580-583; A602-605).  Pankey responded via letter dated July 11, 2016, advising that he had provided a copy of the requested APS and Other Income Questionnaire Disability Benefits form.  (Doc 21-2, AR3152-3153, 3159-3160; A.3174-3175, 3181-3182) Pankey did not provide his tax return, questioning Aetna's ability to maintain the confidentiality of his information.  (Doc 21-2, AR3152; A3174.)

Pankey was persistently concerned with Aetna's ability to maintain confidentiality but was particularly concerned given the fact that Aetna admitted that it had allowed his personal information to be disclosed to others.  See Aetna's

9

letter to Pankey dated September 21, 2015 (Doc 21-2, AR3004-3008; A3026-3030), Pankey's response thereto dated September 30, 2015, (Doc 21-2, AR3009-3011; A3031-3033) and Aetna's October 15, 2015 letter (Doc 21-2, AR3020; A3042).

Aetna requested Pankey's 2015 tax return again via letter dated September 28, 2016.  (Doc 21-1, AR590-592; A612-614.)  Aetna, via letter dated January 26, 2017, requested Pankey's 2015 and 2016 tax returns.  (Doc 21-1, AR593-594; A615-616.)  The same request was made via letter dated February 28, 2017.  (Doc 21-1, AR595-596; A617-618.)  Pankey responded to the request for other income information via letter dated February 16, 2017.  (Doc 21-1, AR1023-1029; A1045-1051.)  He did not provide tax returns but did provide his SSA earnings record.  (Doc 21-1, AR1023; A1045.)  On May 31, 2017, Aetna approved his claim through June 30, 2018.  (Doc 21-1, AR356; A378.)

Aetna requested additional information to support Pankey's claim via letter dated February 2, 2018 (Doc 21-1, AR597-598; A619-620), March 2, 2018 (Doc 21-1, AR599-600; A621-622) and April 2, 2018 (Doc 21-1, AR601-603; A623-625).  Aetna did not request tax returns during this time.  (Doc 21-1, AR597-603; A619-625.)  Via letter dated May 9, 2018, Aetna terminated Pankey's benefits again.  (Doc 21-1, AR603-605; A625-627.)  The termination was based on his failure to return to Aetna the LTD Employee Questionnaire which included questions about his ability

10

to work and other income.  (Doc 21-1, AR603-604; A625-626.)  Aetna reinstated the benefits via letter dated August 23, 2018.  (Doc 21-1, AR606; A628.)  In that letter, it noted that it received the LTD Employee Questionnaire completed by Pankey on February 19, 2018 on August 20, 2018.  *Id*.

Aetna next requested that Pankey complete a Medical Professionals List as detailed in its letters dated August 30, 2018 (Doc 21-1, AR607-610; A629-632), September 21, 2018 (Doc 21-1, AR611-613; A633-635) and October 15, 2018 (Doc 21-1, AR613-616; A635-638).  This list was received on or about October 26, 2018.  (Doc 21-1, AR657; A679.)  Via letter dated October 31, 2018, Aetna requested that Pankey provide medical records from various providers.  (Doc 21-1, AR616-617; A638-639.)  It made the same request via letter dated November 27, 2018.  (Doc 21-1, AR617; A639.)  Aetna requested additional medical records via letter dated December 19, 2018.  (Doc 21-1, AR642-643; A664-665.)  Via letter dated January 18, 2019, Pankey's benefits were again terminated.  (Doc 21-1, AR656-659; A678-681.)

On or about February 1, 2019, Aetna received an APS confirming Pankey's continued treatment and hearing loss.  (Doc 21-1, AR412-414, 1044; A434-436, 1066.)  Benefits were again approved via letter dated February 4, 2019.  (Doc 21-1, AR659-660; A681-682.)  Aetna also received a letter from Dr. Spiegel dated February 7, 2019, advising of his continued hearing loss.  (Doc 21-1, AR417,

11

1046-1048; A439, 1068-1070.)   Additional information was received from Dr. Spiegel in February and March 2019.  (Doc 21-1, AR1049-1052; A1071-1074.)

Via letter dated April 25, 2019, Aetna requested 2016, 2017, 2018 business tax returns.  (Doc 21-1, AR681-683; A703-705.)  Pankey did not provide his personal joint tax returns but did provide an Other Income Questionnaire Disability Benefits form dated May 16, 2019 (Doc 21-2, AR3361-3362; A3383-3384), his SSA earnings record (Doc 21-2, AR3353-3356; A3375-3378) and Brown Little Development K-1 schedules for 2016, 2017 and 2018 (Doc 21-2, AR3357-3359; A3379-3381).  (Doc 21-2, AR3348-3362; A3370-3384.)

A year later, via letter dated May 6, 2020, Aetna requested 2019 tax returns. (Doc 21-1, AR686-696; A708-718.)  It made the same request via letter dated September 3, 2020.  (Doc 21-1, AR715-725; A737-747.)  Pankey again did not provide his personal joint tax returns but did provide Brown Little Development K-1 schedule for 2019.  (Doc 21-1, AR1085-1087; A1107-1109.)

Via letter dated June 21, 2021 (Doc 21-1, AR705-715; A727-737), July 26, 2021 (Doc 21-1, AR716-725; A738-747) and December 9, 2021 (Doc 21-1, AR725-735; A747-757), Aetna requested continued claim information including 2020 tax returns/K-1 forms.  Via letter dated May 2, 2022, Aetna requested continued claim information including 2020 and 2021 tax returns/K-1 forms.  (Doc 21-1, AR745-755; A767-777.)  Via letter dated July 15, 2022, Aetna again terminated his claim for

12

failing to provide requested information.  (Doc 21-1, AR755-758; A777-780.)  In that letter Aetna acknowledged that its decision "is not a decision about whether you are disabled."  (Doc 21-1, AR756; A778.)  Instead, it sought information showing that he continued to treat for his condition and financial information.  *Id.*

Pankey appealed the termination decision via letter dated January 6, 2023. (Doc 21-1, AR966-973; A988-995.)  In the appeal, Pankey provided a total of 348 pages (Doc 21-1, AR967; A989) which included a letter from Dr. Spiegel dated January 4, 2023 (Doc 21-1, AR961; A983) and his SSA earnings record (Doc 21-1, AR962-965; A984-987).  Via letter dated February 3, 2023, Aetna advised that it still needed an updated Claimant Questionnaire and 2020 and 2021 tax returns/K-1 forms. (Doc 21-1, AR762; A784.)  In Aetna's follow-up letter dated February 20, 2023, it advised that it still needed his Claimant Questionnaire and 2020 and 2021 tax returns/K-1 forms.  (Doc 21-1, AR775-776; A797-798.)  Pankey did not provide the requested information and the decision to terminate benefits was upheld on appeal as set forth in Aetna's March 8, 2023 letter.  (Doc 21-1, AR792-794; A814-816.)

Aetna's claim notes documenting the processing of the claim are included in the Administrative Record at (Doc 21-1, AR1-478; A23-500.)

▪ **<u>APPLICABLE PLAN PROVISIONS</u>**

As indicated in footnote 1 above, the applicable Plan documents are included in the Administrative Record at Doc 21-2, AR3375-3431; A3397-3353.  That group

of documents includes the following:  the Policy "shell" and the Certificate, including the Schedule of Benefits (these terms defined at Doc 21-2, AR3375; A3397).  The Policy shell ("GP") is at Doc 21-2, AR3375-3396, AR3430-3431; A3397-3418, A3452-3453; the Schedule of Benefits ("SOB") is at Doc 21-2, AR3397-3399; A3419-3421; and the Certificate ("COI") is at Doc 21-2, AR3400-3426; A3422-3448.  The GP, SOB and COI, together, make up the LTD Plan.  Doc 21-2, AR3383; A3405, AR3402; A3424 and AR3431; A3453.  This set of documents also include "additional information," not part of the COI or the LTD Plan, identified as a portion of the Summary Plan Description required by ERISA ("Part SPD").  Doc 21-1 and 21-2, AR3427-3429; A3449-3451 and AR1066-1067; A1088-1090.  The pertinent LTD Plan provisions are as follows:

> **Test of Disability** *(GR-9N 06-010 02)*
> From the date that you first became disabled and until monthly benefits are payable for 24 months you meet the test of disability on any day that:
>
> ▪ You cannot perform the **material duties** of your **own occupation** solely because of an **illness**, **injury** or disabling pregnancy-related condition; and
> ▪ Your earnings are 80% or less of your **adjusted predisability earnings**.
>
> **After the first 24 months of your disability** that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any

14

**reasonable occupation**[4] solely because of an **illness**, **injury** or disabling pregnancy-related condition.

Doc 21-2, AR3407; A3429.

> **When Long Term Disability Benefit Eligibility Ends** *(GR-9N 06-025 01)*
> You will no longer be considered as disabled nor eligible for long term monthly benefits when the first of the following occurs:
>
> ▪ The date you no longer meet the LTD test of disability, as determined by **Aetna**.
> ▪ The date you are no longer under the regular care of a **physician**.
> ▪ The date **Aetna** finds you have withheld information about working, or being able to work, at a **reasonable occupation.**
> ▪ The date you fail to provide proof that you meet the LTD test of disability.

Doc 21-2, AR3408; A3430.

> **Aetna Requires Proof of Other Income** *(GR-9N-06-080 01)*
> **Aetna** may require proof:
> . . . .
>
> ▪ That the person has sent **Aetna** copies of documents showing the effective dates and amounts of other income benefits.
> ▪ Of income you receive from any work for pay or profit.
> . . . .
>
> If you do not provide the proof that **Aetna** may require, **Aetna** has the right to suspend or adjust this plan's

---

[4] The LTD Plan definition of reasonable occupation is at Doc 21-2, AR3424; A3446.

> benefits by the estimated amount of the other income benefits.

Doc 21-2, AR3412-3413; A3433-3435.[5]

## C. STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *See, e.g., S.-Owners Ins. Co. v. MAC Contractors of Fla., LLC*, No. 18-13040, 2019 WL 1567761, at *1 (11th Cir. Apr. 11, 2019). The Court applies the same standard that district courts are required to follow. *Warrior Tombigbee Tramp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). Summary judgment is proper only if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1368-69 (11th Cir. 1982). This Court also reviews the district court's determination of coverage under an insurance policy *de novo*. *See Fireman's Fund Ins. Co. v. Tropical Shipping & Constr. Co.*, 254 F.3d 987, 1003 (11th Cir. 2001).

---

[5] The LTD Plan also has a provision that allows work earnings to be offset. Doc 21-2, AR3407-3408, A3429-3430.

16

## SUMMARY OF THE ARGUMENT

This matter is governed by the ERISA.  Pankey seeks continued LTD benefits. What is unusual about this case is that the issue is not whether Pankey is disabled. Pankey is deaf and, from a medical standpoint, there is no dispute but that he is disabled.  Pankey became disabled on or about September 26, 2011.  He received LTD benefits from December 26, 2011 until July 15, 2022, more than 10 years. Benefits were terminated based on Pankey's alleged failure to provide certain financial information.  The issue in this case centers on the specific financial information requested by Aetna, the contents of Aetna's July 15, 2022 termination and the extent in complied with the requirements of the applicable ERISA regulations and the LTD Plan terms.

Pankey maintains that Aetna's termination letter violates applicable ERISA regulations by not specifically explaining why benefits were terminated. Confusingly, the termination letter indicates that the termination decision is not about whether Pankey is disabled on the one hand, and, then, on the other hand indicates that benefits are terminated because he failed to meet the disability test in the LTD plan.

Moreover, the primary financial information at issue, information about Pankey's passive real estate investment, is not "earnings" which would affect Pankey's disability benefits and is therefore irrelevant.

17

Additionally, Aetna repeatedly requested that Pankey provide personal tax returns. While his claim was paid, he never provided those tax returns – although he did previously provide some tax returns and K-1 schedules for his passive real estate investment. Aetna's termination letter is unreasonable because it terminated benefits in part because Pankey did not provide personal tax returns – documents that had never been required by Aetna in order to receive benefits.

Finally, even if Pankey failed to provide financial information he was required to send, benefits should only have been suspended, not terminated, pursuant to the LTD Plan terms.

## ARGUMENT

**The District Court Erred In Concluding That Aetna's Termination Of Disability Benefits Was Not Wrong And Arbitrary And Capricious**

### A.    ERISA Standard Of Review

ERISA's civil enforcement statute, ERISA § 502, 29 U.S.C. § 1132 does not provide any guidance regarding the standard of review to be employed in claims for welfare benefits. However, in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held:

> [A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Id*. at 115.

18

The Eleventh Circuit has outlined a six-step framework for evaluating ERISA claims:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011)(citation omitted).    "A pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its

19

own funds." *Blankenship*, 644 F.3d at 1355 (citing *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S. Ct. 2343, 2348, 171 L.Ed.2d 299 (2008)).

The LTD Plan (GP) at Doc 21-2, AR3394; A3416 provides as follows:

> **Claim Determinations; ERISA Claim Fiduciary**.  For the purpose of section 503 of Title 1 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), We are a fiduciary with complete authority to review all denied claims for benefits under this Policy. . . . In exercising such fiduciary responsibility, We shall have discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein.  We shall be deemed to have properly exercised such authority unless We abuse our discretion by acting arbitrarily and capriciously.  (emphasis added)

This language appears sufficient to allow the Court to decide this matter using the arbitrary and capricious standard of review.  However,

> [a]lthough review pursuant to the arbitrary and capricious standard is thus extremely deferential, "[i]t is not, however, without some teeth.  Deferential review is not no review, and deference need not be abject." *Smith v Bayer Corp. Long Term Disability Plan*, 275 Fed.Appx. 495, 504 (6th Cir.2008); *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d at 172.  It "does not require [the court] merely to rubber stamp the administrator's decision.  Instead, [the court is] required to review the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Smith v. Bayer Corp. Long Term Disability Plan,* 275 Fed.Appx. at 504; *Glenn v. MetLife,* 461 F.3d at 666, *aff'd Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S. Ct. 2343, 171 L.Ed.2d 299 (2008). If the administrative record does not show that the administrator offered a "reasoned explanation" based on

20

> substantial evidence, the decision is arbitrary or capricious. *Moon [v. Unum Provident Corp.],* 405 F.3d [373] at 379 [(6th Cir. 2005)].

*Reed v. Metropolitan Life Insurance Company*, 944 F.Supp.2d 1279, 1316-1317 (N.D. Ga. 2013).

Here, under arbitrary and capacious standard of review, the decision is both wrong and arbitrary and capricious and therefore Pankey is entitled to judgment in his favor.

**B.   The Decision Is Wrong And Arbitrary And Capricious**

- Preliminary Matters

The relationship between Aetna and Pankey was contentious and fraught with mistrust almost from the very beginning of the claim.  In a Claim Diary Note ("CDN") dated December 12, 2022, Aetna noted that the claim has "become contentious."  Doc 21-1, AR2; A24.  In a CDN dated March 7, 2013, it was noted that it was a "very contentious claim with a deaf claimant."  *Id*.  In a CDN dated December 19, 2013, it was noted that "CLAIMANT HAS AN ADVERSARIAL RELATIONSHIP WITH AETNA AND ELECTS NOT TO COMMUNICATE VIA EMAIL DUE TO HIS DX [diagnosis] OF SEVERE BILATERAL SENSORINEURAL HEARING LOSS."  *Id*.

Over the years Pankey filed numerous legal, administrative and other complaints against Aetna and/or its vendors based on the handling of his claim.

21

Pankey received disability benefits from December 26, 2011 until July 15, 2022. During that period of time, Aetna terminated his benefits on five separate occasions (see letters dated January 3, 2014 (Doc 21-1, AR1503, AR1506-1511; A1525, 1528-1533), June 22, 2015 (Doc 21-1, AR561-563; A583-585), May 9, 2018 (Doc 21-1, AR603-605; A625-627), January 18, 2019 (Doc 21-1, AR656-659; A678-681), July 15, 2022 (Doc 21-1, AR755-758; A777-780)).   Pankey believed Aetna was repeatedly terminating his benefits in retaliation for the various complaints he filed.  Doc 21-1, AR999 and AR1020; A1021 and 1043[6].

With respect to the financial information requested, Pankey was also concerned (rightfully so[7]) that Aetna would not protect the confidentiality of the information provided.   Aetna repeatedly requested that he provide personal tax returns.  It should be noted that despite Aetna's repeated requests, Pankey never provided any personal tax returns.  These returns contained confidential personal information, including information regarding the joint filer, his spouse.  See, e.g.,

---

[6] Apparently, in response to the term "retaliation" in this sentence, the Court noted that Pankey had not made a claim for retaliation under ERISA in the Complaint and to the extent he attempted to do so in his motion for summary judgment, it was too late.  Doc 33, 9-10; A3604-3605.  Pankey has not attempted to bring a claim for retaliation in this action.  That, however, does not mean that Pankey's state of mind and the course of dealing between Pankey and Aetna is irrelevant in examining the propriety of Aetna's termination decision.

[7] As set forth above, Pankey was particularly concerned with Aetna's ability to protect his confidential information after it conceded it allowed his personal information to be disclosed to others.  Doc 21-2, AR3004-3008;  A3026-3030.

Doc 21-2, AR2768; A2750.  Aetna conceded that its primary concern was with the business entity, Brown Little Development.  Doc 21-1, AR556-558; A578-580. Pankey explained that Brown Little Development was a passive real estate investment.  Doc 21-2, AR2815; A2837.  After some assurances that the information would remain confidential, he did provide Brown Little Development tax returns for 2011-2014. Doc 21-1 and 21-2, AR982-983, 3085-3107; A1004-1005, 3107-3129.  Additionally, he provided Brown Little Development K-1 schedules for 2016[8], 2017, 2018 and 2019.  Doc 21-2, AR3357-3359, AR1085-1087; A3379-3381, 1107-1109.

Pankey suffers from severe to profound sensorineural hearing loss.  Doc 21-1, AR1047; A1069.  Even Aetna admits that this condition is permanent.  Doc 21-1, AR5; A27 (CDN dated August 23, 2018 "his condition is noted to be permanent by multiple reviews.") and Doc 21-1, AR756; A778 (the termination of benefits at issue here is "not a decision about whether you are disabled.").  Moreover, Pankey has repeatedly advised that he is not working.  Doc 21-1 and Doc 21-2, AR1655, AR1475 and AR983 (letter dated December 8, 2015), AR997, AR3300 and AR3361; A1187, 1497, 1005, 1019, 3322, 3383.  Pankey's frustration is understandable.

---

[8] In reviewing the claim file, it does not appear that Pankey ever provided a Brown Little Development tax return or K-1 schedule for 2015.

- Pankey Provided The Information Requested By Aetna And/Or Aetna Has Not Shown That The LTD Plan Requires That Pankey Provide Tax Returns/K-1 Schedules From Brown Little Development

29 C.F.R. § 2560.503-1(g)(1)(i) and (ii) provides that a termination letter must include the specific reason or reasons for the adverse determination and reference to the specific Plan provision upon which the termination is based. Additionally, 29 C.F.R. § 2560.503-1(g)(1)(vii)(C) provides that with respect to a disability claim, the administrator must also disclose internal guidelines used. As to the specific reason, the July 15, 2022, letter terminating benefits clearly indicates that benefits were terminated because Pankey failed to provide a "completed Attending Physician Statement (APS) form from your doctor; as well [as] . . . an LTD Claimant Questionnaire form." Doc 21-1, AR756; A778. Benefits were also terminated because Pankey failed to provide "2020 AND 2021 [sic] Tax Returns/Schedule K-1 form for confirmation of any business earnings for 2020-2021." *Id.*

Additionally, in compliance with the about quoted regulation, the letter also cites to two LTD Plan provisions upon which the termination was based. Specifically, the letter cites to: 1) the definition of disability (and its component, reasonable occupation) and 2) the LTD Plan provision detailing under what circumstances LTD benefits end. Doc 21-1, AR756; A778. Finally, the letter cites to Aetna's internal guidelines relating to proof of loss. Doc 21-1, AR756-757: A778-779.

24

Confusingly, the letter <u>does not</u> cite to the Plan provisions allowing an offset of work earnings against benefits. Doc 21-2, AR3407-3408, AR3412-3413; A3429-3430, 3434-3430[9]. Accordingly, Aetna's termination letter advises Pankey that the information it is requesting is needed only to determine whether he meets the "Test of Disability," whether he is under the regular care of a physician and whether he has withheld information about working or being able to work at a reasonable occupation (again, a component of the Test of Disability).[10] The problem, of course, is that the termination letter also clearly indicates that:

> The Social Security Administration (SSA) doesn't require that you remain under the regular care of a physician, or that you regularly submit proof of loss. However, your policy does require that you do both those things in order to continue receiving benefits. <u>This is not a decision about whether you are disabled</u>. (emphasis added)

Doc 21-1, AR756; A778. Which is it? – either Aetna is evaluating whether he met the Test of Disability or it was not. They told him two completely contradictory

---

[9] Immediately after the section dealing with Other Income Benefits is a more general section dealing with the requirement that claimants provide proof of certain other income. This section includes a provision requiring proof to work earnings. Doc 21-2, AR3413, A3435.

[10] The LTD Plan provision describing when LTD benefits end lists 13 separate events which can trigger the termination of benefits. All 13 are listed in the termination letter. However, only the first four could possibly apply to Pankey's claim. Those four are as follows: 1) the date you no longer meet the LTD test of disability, as determined by Aetna; 2) the date you are no longer under the regular care of a physician; 3) the date Aetna finds you have withheld information about working, or being able to work, at a reasonable occupation; and 4) the date you fail to provide proof that you meet the LTD test of disability. Doc 21-2, AR3408; A3430.

things.   It is impossible for Pankey to have understood why some of this information was necessary pursuant to the terms of the LTD Plan.   The only information Aetna clearly wanted (and which was not contradicted by other language in the termination letter) was proof that Pankey remained under the regular care of a physician.

Pankey appealed the decision and specifically provided proof that he was under the regular care of a physician.  Doc 21-1, AR966, 961; A988, 983.  Since the other information requested by Aetna must have related to whether Pankey met the Test of Disability – and Aetna was not seeking to determine whether he was disabled – it was unreasonable for Aetna to request this information.  Accordingly, the termination decision, based on the failure to provide this information, should be overturned as it was both wrong and arbitrary and capricious.  At the very least, Aetna's failure to explain why this information was relevant denied Pankey the right to a full and fair review under ERISA.  Given the inconsistent language in the termination letter, if Aetna's decision is not overturned, the matter should be remanded to Aetna to allow Pankey to provide additional information[11].

---

[11]   *Jackson v. Fort Dearborn Life Insurance Company,* Civil Action No. 2:10cv60-MHT, 2010 WL 3880157, at * 8 (M.D. Ga. Sept. 28, 2010)(dealing with the exhaustion of administrative remedies issue, the Court noted that "in a more recent case involving a profit sharing plan claim, the Eleventh Circuit concluded that a benefit determination letter was inadequate and, following *Counts* [*v. American General Life and Acc. Ins. Co.,* 111 F.3d 105, 108 (11th Cir. 1997)]

26

All that being said, <u>maybe</u> Aetna's statement that it was not evaluating Pankey's disability related only to his <u>physical</u> condition.  <u>Maybe</u>, Aetna requested the financial information to determine whether Pankey met the <u>financial</u> elements of the Test of Disability.  If that were the case, then Aetna had no authority to request tax returns related to Pankey's passive real estate investment with Brown Little Development.

The applicable portion of the Test of Disability provides as follows:

> **After the first 24 months of your disability** that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness**, **injury** or disabling pregnancy-related condition.

Doc 21-2, AR3407:A3429.  Reasonable occupation is defined as:

> **Reasonable Occupation**
> This is any gainful activity:
> - For which you are, or may reasonably become, fitted by education, training, or experience, and
> - Which results in, or can be expected to result in, an income of more than 60% of your **adjusted predisability earnings.**

---

suggested that the district court should remand the case so that the plaintiff could appeal before the plan administrator. *Cromer–Tyler v. Teitel,* 294 Fed. Appx. 504, 508 (11th Cir. 2008). The Eleventh Circuit explained that the letter was inadequate because: (1) "it provided a determination of benefits without stating a specific reason for the determination"; (2) "it did not specify the particular provision on which the determination was based"; and (3) "it did not describe the procedures necessary to review the claim." *Id.")*

Doc 21-2, AR3424; A3446.  Accordingly, Pankey's benefits could be terminated only if he was able to work[12] and was able to earn more than 60% of his adjusted predisability earnings.  The key is, per the above definition, the earnings must come from "work."  The LTD Plan does not impose any limitation on a claimant's ability to earn money from investments.  A claim must continue as long as the claimant is "unable to work."  Pankey could make as much money as he desired (or was able to) from his passive investments and benefits would still be payable.

In *Cates v. Reliance Standard Insurance Company*, Civil Action File No. 1:18-cv-543-TCB, 2019 WL 4751860 (N.D. Ga. July 2, 2019), the Plaintiff, Cates, was an interventional cardiologist who became disabled in about 2009.  The Plan was a "own occupation" Plan, meaning that he was entitled to benefits as long as he remained disabled from his own occupation.  Like here, after Defendant, Reliance's "approval of Cate's claim, the parties squabbled at times over Cate's benefit payments, including threatened suspensions of benefits and missed payments. . . ."  *Cates,* Civil Action File No. 1:18-cv-543-TCB, 2019 WL 4751860

---

[12] The Court should note that this is essentially an intellectual exercise.  Aetna told Pankey that it was not assessing his disability and it is impossible to unwind the physical aspects of a claimant's disability from the financial aspects.  Specifically, adding the reasonable occupation definition to the Test of Disability definition demonstrates that benefits are payable if claimant is "unable to work at any" "gainful activity" "[f]or which you are, or may reasonably become, fitted by education, training, or experience [physical aspects of disability], and" "[w]hich results in, or can be expected to result in, an income of more than 60% of your **adjusted predisability earnings**. [financial aspects of disability]."

28

at *2.  After benefits had been paid for years, Reliance started questioning whether Cates had an ownership interest in any business.  It sought this information to determine if his benefits could be reduced by offsetting any such earnings.  In support of its position, Reliance relied on the Plan's Other Income Benefits ("OIB") provision and the Plan's Rehabilitation Benefit ("RB").

Answering Reliance's requests,

> On March 23, 2017, Cates responded as follows. He stated that (1) he had not returned to work, and (2) he had an ownership interest in multiple businesses, primarily limited liability companies, and that his investment in the limited liability companies was passive, "no different than ownership of stock or other securities." He also stated that he was a managing member of certain limited liability companies but did "not perform work in any gainful occupation related to his prior medical specialty, or for which he is qualified by his training, education, or experience." *Id.* Finally, he stated that he did not anticipate that he would ever be able to return to work in any capacity.  (internal citation omitted)

*Id.* at *3.  On May 15, 2017, Reliance requested, for the first time, Cates tax returns going back to 2009.  Several months later, Reliance terminated his benefits for failure to provide the requested documents.

In ruling in favor of Cates, the Court found that Reliance's termination decision was de novo wrong in that Plan did not specifically require plaintiff to produce his tax returns and the provision cited by Reliance to support the termination of benefits (OIB) did not apply.  Moreover, the Court found that the

29

decision was arbitrary and capricious. It found that "no reasonable grounds existed for Reliance's decision to demand copies of Cate's tax returns" since the alternative Plan provision (RB) required work, supervised by a physician or licensed/certified rehabilitation specialist approved by Reliance, and his passive income was not so supervised. Id. at *7.

As in *Cates*, Aetna's request for Pankey's tax returns describing any passive income he earned from Brown Little Development is irrelevant as to whether he met the Test of Disability in the LTD Plan. Pankey is entitled to continued LTD benefits as long as he is "unable to work at any reasonable occupation." His passive investment income does not constitute "work" at a reasonable occupation. The LTD Plan does not define the term "work" but it is used throughout the policy in the traditional sense, to wit: a job or occupation. See Doc 21-2, AR3404; A3426 (claimants are eligible for coverage if they are "actively at work") and ("scheduled to work on a regular basis at least 30 hours per week"); Doc 21-2, AR3407; A3429 (benefits can be adjusted if claimants work while disabled – work includes activity with "[y]our employer or any other employer, employment or self employment; or [a]ny occupation or compensation or profit") and the term actively at work and similar terms defined as work at "your employer's scheduled work days if, on that day, you are performing the regular duties of your job on a full-time basis for the number of hours you are normally scheduled to work.") As noted in *Zanny v.*

30

*Kellogg Company*, No. 4:05-CV-74, 2006 WL 1851236, at \*10 (W.D. Mich. June 30, 2006), "[i]ncome from passive investments is consistent with disability since it does not reflect upon one's ability to engage in active work." (footnote and citation omitted)).

The District Court addresses this argument in ruling against Pankey on the cross motions for summary judgment.  Doc 33, 11-12; A3606-3607.  There, the District Court notes that even if it agreed with Pankey's interpretation of the term "work," it is the "Defendant [not Pankey, that] has the 'right to adopt reasonable policies, procedures, rules, and interpretations of this Policy to promote orderly and efficient administration.' "  Doc 33, 11; A3606 (internal citations omitted). The District Court goes on to note that " '[T]he arbitrary and capricious standard of review would have little meaning if ambiguous language in an ERISA plan were construed against the [plan administrator].' *White v. Coca-Cola Co.*, 542 F.3d 848, 857 (11th Cir. 2008) (quoting *Cagle*, 112 F.3d at 1519)."  Doc 33, 11-12; A3606-3607.  As noted by the District Court, an administrator can interpret plan provisions if allowed by the plan (like here) – <u>but only if such provision is ambiguous</u>.  The term "work" is not ambiguous and must be given its plain meaning[13].  "Courts have recognized that a plan interpretation is arbitrary and

---

[13]  The District Court noted that "Though Plaintiff admits the Plan does not define the term 'work,' Plaintiff nonetheless argues that the use of the term 'work'

31

capricious when the plan administrator 'construe[s] provisions of a plan in a way that clearly conflicts with the plain language of the Plan,' when the interpretation 'renders nugatory other provisions of the Plan,' and when the Plan administrator's construction of the provision 'lacks any rational nexus to the primary purpose' of the Plan. *Bryant v. Commuity Bankshares, Inc.*, 265 F. Supp. 3d 1307, 1324 (M.D. Ala. 2017), *aff'd*, 736 F. App'x 841 (11th Cir. 2018)(quoting *Tapley v. Locals 302 & 612 of the Int'l Union of Operating Eng'r–Emp'rs Constr. Indus. Ret. Plan*, 728 F.3d 1134, 1139 (9th Cir. 2013)(internal citations, brackets, and quotation marks omitted)).

As used here, "work" is being paid for performing certain activity. *Work*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/work (last visited August 26, 2025)(including a definition stating, "to perform work or fulfill duties regularly for wages or salary"). Any sums received from Brown Little Development are investment income Pankey received <u>despite not working</u>. Therefore, Pankey is not required to provide this information pursuant to the terms of the LTD Plan.

---

excludes his 'ability to earn money from investments,' which he describes as 'passive' in nature. (Doc 22 at 20–22)." Failing to define a term does not per se create an ambiguity. *Dahl-Eimers v. Mutual of Omaha Life Ins. Co.*, 986 F.2d 1379, 1382 (11th Cir. 1993).

Nonetheless, it should also be noted that even though Pankey did not provide 2020-2021 tax returns/K-1 schedules for Brown Little Development, he did provide, as he had done in the past, his income information. In particular, he provided his SSA earnings record which he described in the appeal letter. Doc 21-1, AR966-967 and AR962-965; A988-989 and 962-963. He described in his appeal letter that if he had any earnings, even if those earnings were from self-employment, they would be listed in his SSA earnings record. Aetna acknowledged receiving this document. However, again confusingly, Aetna dismissed the document without explaining why. In particular, Aetna's February 3, 2023, letter indicates as follows: "[i]n addition, we received the Social Security statement, dated January 4, 2023, that states that they already receiving benefits, they are not going to provide estimates."[14] Apparently, the appeal examiner only reviewed the first page of this document. The first page of the document (Doc 21-1, AR962: A984) does indicate under the heading entitled "Retirement Benefits" "[w]e are not giving you estimates because our records show that you are already receiving or have qualified for benefits." However, the appeal examiner should have turned to the second page (Doc 21-1, AR963: A985) where it identifies his earnings record from 2011 to 2022. As detailed therein, he had no earnings from

_____

[14] Aetna used the same language in its letter dated February 20, 2023 (Doc 21-1, AR775-776; A797-798) and similar language in its final decision letter dated March 8, 2023 (Doc 21-1, AR792; A814).

33

2013 until 2021.  Aetna apparently ignored this record of his income and certainly did not advise him that such a record was insufficient and only tax returns/K-1 schedules would suffice.

Clearly, Aetna's decision is both wrong and arbitrary and capricious and should be reversed.  At the very least, given the confusing language in Aetna's multiple letters, the Court should remand the matter to Aetna to allow Pankey to submit additional information.

- Aetna's Termination Of Disability Benefits Is Wrong And Arbitrary And Capricious Despite Pankey's Failure To Provide K-1 Schedules For Brown Little Development

Via letter dated June 21, 2021 (Doc 21-1, AR705-715; A727-737), July 26, 2021 (Doc 21-1, AR716-725; A738-747) and December 9, 2021 (Doc 21-1, AR725-735; A747-757), Aetna requested continued claim information including 2020 tax returns/K-1 forms.  Via letter dated May 2, 2022, Aetna requested continued claim information including 2020 and 2021 tax returns/K-1 forms.  (Doc 21-1, AR745-755; A767-777.)  Via letter dated July 15, 2022, Aetna again terminated his claim for failing to provide requested information including 2020 and 2021 tax returns/K-1 forms.  (Doc 21-1, AR755-758; A777-780.)

Pankey received disability benefits from December 26, 2011 (Doc 21-1, AR522; A544) until July 15, 2022 (Doc 21-1, AR756: A778), more than 10 years.[15] During that time, Pankey never provided any personal tax returns. Nonetheless, Aetna accepted the information he provided and paid benefits. Moreover, after a prolonged dispute between Pankey and Aetna over the provision of tax information, Aetna, via letter dated February 24, 2015, acknowledged that its concern regarding work earnings centered around a business entity called "Brown Little Development." Doc 21-1, AR556-558; A578-580. Pankey initially provided tax returns for Brown Little Development from 2011 to 2014. However, thereafter, he provided only Schedule K-1 forms for his share of the Brown Little Development earnings for 2016[16] (Doc 21-2, AR3357; A3379), 2017 (Doc 21-2, AR3358; A3380), 2018 (Doc 21-2, AR3359; A3381) and 2019 (Doc 21-1, AR1087; A1109). Aetna accepted these tax documents and paid benefits.[17]

---

[15]  Benefits are potentially payable until September 30, 2039, another 17 years. Doc 21-1, AR38: A60 ("Benefit End Date: 09/30/2039").

[16]  It does not appear that Pankey ever provided a Brown Little Development tax return or K-1 schedule for 2015.

[17]  See Claim Diary Note ("CDN") dated May 22, 2019 (Doc 21-1, AR433: A455) wherein Aetna's Senior Ability Specialist, Katherine Tanguay (Doc 21-1, AR1; A23-identifying the adjusters title) noted that Pankey had provided a Social Security letter noting that he was not working as well as 2016, 2017 and 2018 Schedule K-1 forms showing Brown Little Development operating at a loss. Weeks later in a CDN dated June 27, 2019 (Doc 21-1, AR436-439; A458-461), Ms. Tanguay reviewed the evidence provided noting that "Clm [claim] was closed at test change for occs [occupations] identified. Appeals overturned but req[uired]

In the R&R at Doc 29, 18; A3574, United States Magistrate Judge Embry J.

Kidd noted that:

> Plaintiff received disability benefits from December 26, 2011, AR522, until July 15, 2022, AR756—more than 10 years. During that time, Plaintiff never provided any personal tax returns and Defendant still paid benefits. . . . Aetna, for years, determined that benefits were payable pursuant to the terms of the LTD Plan based on Plaintiff's provision of the Schedule K-1 forms for Brown Little Development. It is unclear, based on the entirety of the record and the parties' lengthy history, why the termination at issue in this case was different.

In evaluating Aetna's objections to the R&R, the District Court, addressing United

States Magistrate Judge Embry J. Kidd finding/question, "why the termination at

issue in this case was different" (*Id.*) found as follows:

> Because the Plan's terms vest Aetna with the "discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms," Aetna could have deliberately construed the terms of its plan in a light favorable to Plaintiff and allowed the K-1 forms as a substitute. (Doc. 21-2 at 1409).  But it is undisputed that Plaintiff did not provide

---

tax info[rmation].  Clm closed for proof as tax info not rec[eived].  clmt [claimant [sic]] re-opened once [tax information] rec. Company [Brown Little Development] operates at a financial loss."  Doc 21-1, AR439; A461.

Likewise, see CDN dated September 24, 2020 (time 12:26 pm)(Doc 21-1, AR444; A466) showing 2019 Schedule K-1 form received and CDN dated September 24, 2020 (time 12:36 pm)(Doc 21-1, AR444; A466) showing Ms. Tanguay's review wherein she noted that 2019 Schedule K-1 showed business loss and that "[t]his loss of Ordinary Business Income would not cause any earnings offset to monthly LTD benefits."  *Id.*

36

> updated K-1 forms in this case as he had done in the past. (*Id.* at 9–10). At a minimum, this change in circumstance weighs against a finding that Defendant abused its discretion in terminating Plaintiff's LTD benefits due to an inconsistent construction of the Plan. Accordingly, the Court will sustain this objection.

Doc 33, 9; A3604. To summarize, the District Court found that 1) Aetna could have accepted the K-1 schedules as a substitute for the personal tax returns; and 2) that the termination decision was not arbitrary and capricious because Pankey provided the K-1 schedules in the past but did not on this occasion.

### 1) Past acceptance of K-1 schedules

While, in the past, Aetna could and did accept K-1 schedules as opposed to personal tax returns, that acceptance is not without consequences. Such acceptance binds Aetna to its prior interpretation of the proof required by the LTD Plan as to Pankey's potential earnings. *Bryant v. Community Bankshares, Inc.*, 265 F.Supp.3d 1307 (M.D. Ala. 2017), *aff'd*, 736 F.App'x. 841 (11th Cir. 2018) is an ERISA case that involved an Employee Stock Ownership Plan ("ESOP"). The ESOP was invested primarily in defendant Community Bankshares, Inc. stock ("Bankshares"). The plaintiffs sought diversification (selling a portion of the Bankshares' stock back to the company). Plaintiffs maintained that the diversification/sale should have taken place on June 30, 2009 which would have allowed them a valuation of $11 per share. The administrator delayed granting the diversification election until the stock price had fallen to $2.30 per share. The decision to delay was caused by a plan

37

interpretation that the proposed deadline was permissive, not mandatory. Plaintiffs sought judgment finding that the diversification date was mandatory and therefore should have been June 30, 2009.

The Court noted that there are multiple factors to be considered in determining whether a decision is reasonable or is arbitrary and capricious. These factors include:

> (1)　whether the plan administrator's interpretation is contrary to the clear terms of the plan; (2) <u>whether the plan administrator has interpreted the terms uniformly</u>; (3) whether the interpretation of the Plan is reasonable and a fair reading of the Plan. . . . (emphasis added)

*Bryant*, 265 F.Supp.3d at 1323-1324. (citations omitted). The Court found that the administrator had consistently interpreted a diversification deadline as mandatory. The Defendants argued that while the standard practice was to implement the diversification election within 180 days of the Plan year in which the election was made (*i.e.*, June 30, 2009), that deadline was permissive, not mandatory pursuant to the Plan terms. The Court rejected defendant's inconsistent interpretation and found that the "foregoing analysis demonstrates that the Plan administrator acted arbitrarily and capriciously in failing to implement the Bryant's diversification elections by the Plan's June 30, 2009 deadline." See also *Epolito v. Prudential Insurance Company of America*, 737 F.Supp.2d 1364, 1375 (M.D. Fla. 2010)(the Court noted that when determining whether an administrator's decision is arbitrary

38

and capricious, the Court should consider, among other factors, the uniformity of construction).

As detailed in these cases, under ERISA, Aetna must uniformly and consistently interpret the terms of the LTD Plan. Aetna, for years, has determined that benefits were payable without the provision of personal tax returns. Despite this fact, benefits were terminated – July 15, 2022 -- in part, because of the failure to provide 2020 and 2021 tax returns. Doc 21-1, AR756; A778. Such decision is both wrong and arbitrary and capricious based on Aetna's prior interpretation of the proof required under the LTD Plan.

2) Pankey's past provision of K-1 schedules

It is true that Pankey did not provide K-1 schedule for Brown Little Development as he had done in the past. Although it may be reasonable to assume that benefits <u>might</u> have been paid if Pankey provided <u>only</u> the Brown Little Development K-1 schedule, that is not the decision being evaluated.

The July 15, 2022 letter noted that benefits were terminated -- in part, because of the failure to provide 2020 and 2021 tax returns/K-1 schedule. Doc 21-1, AR756; A778. Aetna cannot change the basis for its termination now. The applicable ERISA regulations require, among other things, that a denial letter contain: "[t]he specific reason or reasons for the adverse determination. . . ." 29 C.F.R. § 2560.503-1(g)(1)(i). Aetna cannot move the goal post in an attempt to make its unreasonable

39

termination decision requesting personal tax returns -- which by course of conduct/prior LTD Plan interpretation were not necessary.  This is true even if the request for unrequired personal tax returns is combined with a request for K-1 schedules which had previously been provided and accepted.  Aetna has not provided Pankey with a full and fair review if he is left to guess what requested information must be provided and what requested information can be ignored.

- The District Court Erred In Rejecting The Finding In The R&R That Aetna's Decision Was Arbitrary And Capricious Because The Failure To Provide Tax Information Warranted Only A Suspension Of Pankey's Benefits Not A Termination Of Benefits

The District Court noted as follows in addressing Aetna's objections to the R&R:

> As the R&R notes, the Termination Provisions[18] do not similarly condition the proof Plaintiff must submit. (Doc. 21-2 at 1423).  The R&R interprets this language to mean that Aetna lacked discretion to terminate benefits because of insufficient proof, and therefore, as long as Plaintiff submitted *some* proof of income, that was sufficient to avoid termination. However, the R&R fails to consider that the Termination Provisions provide that Aetna may terminate LTD benefits when Plaintiff no longer met the "LTD test of

---

[18]   The LTD Plan provision describing when LTD benefits end lists 13 separate events which can trigger the termination of benefits.  Doc 21-2, AR3408; A3430. The District Court defined "Termination Provisions" as comprising two of the 13: 1) the date you no longer meet the LTD test of disability, as determined by Aetna and 4) the date you fail to provide proof that you meet the LTD test of disability. Doc 33, 3; A3598.

disability, *as determined by Aetna*," or if Plaintiff failed to "provide proof that [he met] the LTD test of disability." (*Id.* (emphasis added)).

The District Court found that Aetna's termination of benefits was based on the failure to provide financial proof under the financial component of the LTD Plan's Test of Disability. Doc 33, 7, 12; A3602, 3607.

The applicable portion of the Test of Disability provides that after the first 24 months of benefits:

> you meet the plan's test of disability on any day you are unable to <u>work</u> at any **reasonable occupation** solely because of an **illness**, **injury** or disabling pregnancy-related condition.

Doc 21-2, AR3407: A3429 (bold in original/underline added). Reasonable occupation is defined as:

> **Reasonable Occupation**
> This is any gainful activity:
> ▪ For which you are, or may reasonably become, fitted by education, training, or experience, and
> ▪ Which results in, or can be expected to result in, an income of more than 60% of your **adjusted predisability earnings.**

Doc 21-2, AR3424; A3446: (bold in original).

In the R&R at Doc 29, 14: A3570, it is noted in general that:

> According to the terms of the Policy, Plaintiff would no longer be considered disabled or eligible for long term monthly benefits if Plaintiff failed to provide proof that he met the LTD Test of Disability. AR3408. The LTD Test of Disability included both a physical and

41

financial component. The parties do not dispute that Plaintiff was physically disabled under the Test. They dispute whether Plaintiff met the financial portion.

It is undisputed that as proof that he had no earnings, Pankey provided his Social Security Administration ("SSA") earnings record dated January 4, 2023. Doc 21-1, AR966, AR962-965; A988, 984-987. He specifically noted in his appeal letter providing this information, "Proof of Loss Claimant received no earnings from working in 2020 or 2021 - refer to a copy of his SSA Earnings Record dated January 4, 2023 (Exhibit 142)." Doc 21-1, AR966; A988. In that letter he also noted that if he had made any money from working, even if it was self-employment, he was required to report this information and that such earnings would have been included in his SSA earnings record. Doc 21-1, AR966-967: A988-989.

Accordingly, Judge Kidd found that Aetna "had *some* proof [of loss] that Plaintiff was not earning money from the SSA statement Plaintiff submitted during his appeal." (Doc 29, 15: A3571)(emphasis in original). Judge Kidd then noted that the Plan "only allows termination [of benefits] when Plaintiff 'fail[s] to provide proof that [he] meet[s] the LTD test of disability.' (Doc 29, 16: A3572) Therefore, as noted by Judge Kidd, the issue was not whether Pankey provided financial information that he met the test of disability (he did) – instead, the issue was that

42

Aetna deemed this information insufficient.  (Doc 29, 16: A3572)("[Pankey's] proof,

however, was not *sufficient* for Defendant.")(emphasis in original)[19].

Since the general termination provision did not address what happens to

benefits if the proof is submitted but deemed *insufficient*, Judge Kidd turned to the

specific Plan provision dealing with proof of income.  In the R&R at Doc 29, 15-16:

A3571-3572, it is noted that:

> To that end, the Policy expressly stated that "Aetna
> Requires Proof of Other Income" and provides that it "may
> require proof . . . [o]f income you receive from any work
> for pay or profit." AR3412-3413. However, that same
> portion of the Policy also stated that if Plaintiff did not
> provide the proof that Defendant may require, Aetna had
> the right to suspend or adjust the Plan's benefits by the
> estimated amount of the other income benefits. AR3413.
> The Policy, by its own terms, then, does not allow
> *termination* when Defendant determines that sufficient
> proof of income is not received. The Policy only allows

---

[19]  If Aetna wanted the "failure to provide proof" provision to cover termination for both the wholesale failure to provide proof of loss and the failure to provide proof that Aetna deemed sufficient, it could have done so with the stroke of a pen.  In fact, in the Plan's termination clause, an additional provision states that benefits can be terminated on "[t]he date you no longer meet the LTD test of disability, as determined by **Aetna**.  Doc 21-2, AR3408: A3430.  Therefore, Aetna knows how to write such a modifying clause, but did not include same in the "failure to provide proof" provision.  See *Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*, No. 21-10242, 2022 WL 6635136, at *4 (11th Cir. Oct. 11, 2022)("where parties use different language in different provisions of a contract, courts presume that those provisions have different meanings." (citations omitted)).  Obviously, this second provision does not apply here as Aetna did not terminate Pankey's benefits because he "no longer meet the LTD test of disability."  Instead, the termination decision was based on the alleged failure to provide sufficient proof.

> termination when Plaintiff "fail[s] to provide proof that [he] meet[s] the LTD test of disability." AR3408.

The Plan does not provide what financial information is deemed to be sufficient to prove disability. The specific provision dealing with proof of income allows Aetna to request specific proof (Doc 21-2, A3412-3413; A3434-3435) but "[i]f you do not provide the proof that **Aetna** may require, **Aetna** has [only] the right to suspend or adjust this plan's benefits by the estimated amount of the other income benefits." Doc 21-2, AR3413; A3435 (bold in original). The Plan does not allow the termination of benefits when Pankey provided *some* financial proof of disability.

As noted in the R&R "claims administrators are allowed relatively broad discretion to determine what constitutes sufficient proof. . . . [b]ut under the terms of its own Policy, Defendant did not have the right to terminate [only suspend/adjust] those benefits." R&R at Doc 29, 16: A3572. That finding is correct. Aetna has discretionary authority under the terms of the Plan, but such discretion allows it only to "construe any <u>disputed or doubtful terms</u> under this Policy, the Certificate or any other document incorporated herein." Doc 21-2, AR3394: A3416 (emphasis added). Such authority does not allow it to rewrite the Plan terms. See, e.g., *Frye v. Thompson Steel Co., Inc.,* 657 F.3d 488, 493 (7th Cir. 2011)("[i]n using such [interpretive] tools, the fiduciary may not, of course, rewrite or modify the plan" (citation omitted)). Aetna's attempt to do so here is arbitrary and capricious.

In its objection to the R&R, Aetna maintains that in deciding whether its underlying decision was arbitrary and capacious, Judge Kidd should not have focused on the Plan's termination provision, but should also have looked to the Plan provision that "provides that 'Benefits will be paid as soon as the ***necessary* proof** to support the claim is received.'  (A3420) (emphasis added)."  Doc 31, 6; A3581. Aetna maintained that the failure to consider this term violates the principle of contract interpretation that the policy should be read as a whole, and every provision given its full meaning.  Doc 31, 5; A3580.  The District Court relied on this provision (identified as the "Payment Provision") in partial support of its conclusion that "[t]hese provisions expressly condition the proof required and thus confer on Defendant discretion to evaluate the sufficiency of Plaintiff's proof of LTD eligibility." Doc 33, 4; A3599.

In fact, Judge Kidd did consider this provision but correctly found that termination provision and the income proof provision (allowing Aetna only to suspend or adjust benefits) controlled.  R&R at Doc 29, 15-16: A3571-3572. Additionally, this provision relied on by Aetna sets forth the Plan terms as to when benefits will start ("Benefits will be paid as soon as the necessary proof to support the claim is received." (Doc 21-2, A3420: A3442)).  Here, benefits had been paid more than 10 years – albeit with several intervening terminations and reinstatements.  The issue is not what proof is necessary to start benefits, but what is necessary to end

45

benefits. Moreover, an equally well-settled canon of contract interpretation provides that when a contract contains both general and specific terms relating to the same subject, the specific controls over general. *United States v. Pielago*, 135 F.3d 703, 710 (11th Cir. 1998). According, Judge Kidd correctly found that the income proof provision governed over the more general termination provision and the much more general provision relating to when benefits start.

It should also be noted that Aetna cannot rely on the provision relating to when benefits start to support its termination decision as this provision was not listed in the July 15, 2022 denial letter terminating benefits. Doc 21-1, AR755-758; A777-780. The applicable ERISA regulations require, among other things, that a denial letter contain: "[r]eference to the specific plan provisions on which the determination is based. . . ." 29 C.F.R. § 2560.503-1(g)(1)(ii). Here, the denial letter cites only to: 1) the definition of disability (and its component, reasonable occupation) and 2) the Plan termination provision. Doc 21-1, AR756, A778. The denial letter also cites to Aetna's internal guidelines relating to proof of loss. Doc 21-1, AR756-757; A778-779. Therefore, the District Court should have adopted the findings in the R&R and granted summary judgment in favor of Pankey.

46

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests that the Court reverse the district court's order granting Aetna's motion for summary judgment and enter and order granting summary judgment in favor of the Appellant.

Dated:  September 2, 2025

　/s/ *Gregory D. Swartwood*　
Gregory D. Swartwood, Esquire
Florida Bar No. 858625
The Nation Law Firm, LLP
570 Crown Oak Centre Drive
Longwood, FL  32750
Telephone:  (321) 3979775
Facsimile:  (407) 867-4845
E-mail:  gswartwood@nationlaw.com
Attorneys for Appelle

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) as the brief contains a total of 11,462 words and excluding those parts exempted by 11th Cir. R. 32-4 this brief contains a total of 11,280 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

 /s/ *Gregory D. Swartwood*
Gregory D. Swartwood, Esquire

## CERTIFICATE OF SERVICE

I hereby certify that on this, the forgoing brief was served to the Clerk of Court using the CM/ECF system, which will automatically send electronic mail notification of such filing to the following counsel of record, who are CM/ECF participants:

*/s/ Denise Dulong*
Counsel Press
1011 East Main Street
Richmond, VA 23219
(212) 377-5266

Filing and service were performed by direction of counsel