_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

JUDSON PANKEY,

*Plaintiff-Appellant,*

v.

AETNA LIFE INSURANCE COMPANY,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Southern District of Florida
No. 6:23-cv-01119-WWB-UAM

_____

## APPELLEE AETNA LIFE INSURANCE COMPANY'S
## ANSWER BRIEF

_____

Jonathan M. Fordin, Esq.
**SHUTTS & BOWEN LLP**
200 South Biscayne Blvd.
Suite 4100
Miami, Florida 33131
(305) 347-7390
*Counsel for Appellee Aetna Life
Insurance Company*

Amy M. Wessel Jones, Esq.
**SHUTTS & BOWEN LLP**
201 East Las Olas Blvd.
Suite 2200
Fort Lauderdale, FL 33301
(954) 847-3889
*Counsel for Appellee Aetna Life
Insurance Company*

**NO. 25-11338**

*PANKEY V. AETNA LIFE INS. CO.*

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Appellee, Aetna Life Insurance Company ("Aetna"), hereby certifies that in addition to the persons listed in the Certificate of Interested Persons set forth in the Initial Brief, the following additional persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

a)  CVS Health Corporation (Stock ticker: CVS)

b)  CVS Pharmacy, Inc.

c)  Hartford Holdings, Inc.

d)  The Hartford Insurance Group, Inc. (Stock ticker: HIG)[1]

---

[1] Appellant's Certificate of Interested Persons states that the stock ticker for a different entity, Hartford Life and Accident Insurance Company, is HIG, but that is inaccurate.  Hartford Life and Accident Insurance Company does not have a stock ticker.

C-1

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Aetna does not believe that oral argument is warranted in this case. Aetna believes the facts and issues are adequately presented in the parties' briefs and record. Aetna therefore believes the decisional process will not be significantly aided by oral argument, and that prompt resolution of this matter on the briefs best ensures the efficient use of judicial resources.

# TABLE OF CONTENTS

<strong>Page</strong>

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ..............................................i

TABLE OF CITATIONS ....................................................................................iv

STATEMENT OF THE CASE.............................................................................1

I. Nature of the Case .................................................................................1

II. Statement of the Facts............................................................................2

    A. Relevant Policy Provisions......................................................2

    B. Pankey's LTD Benefits and Termination Thereof.............................5

    C. Pankey's History of Refusing to Provide Requested Documentation ..........................................................................10

III. Course of Proceedings Below.............................................................13

    A. Relevant Pleadings and Summary-Judgment Motions ......................13

    B. The Magistrate Judge's Report and Recommendation ......................14

    C. The District Court's Order and Judgment..........................................15

IV. Standard of Review.............................................................................19

SUMMARY OF THE ARGUMENT .................................................................21

ARGUMENT .....................................................................................................22

I. Hartford Acted Within Its Discretion in Terminating Benefits Based Upon Pankey's Failure to Provide the Requested Financial Proof-of-Loss Documentation..........................................................................................22

II. None of Pankey's Other Arguments on Appeal Have Merit.......................29

    A. The Termination Letter Clearly Communicated the Reason for Termination of Pankey's LTD Benefits.............................................29

    B. Pankey Never Raised Any Concerns Over Confidentiality from 2021 to 2024, the Timeframe at Issue in the Benefits-Termination at Issue on Appeal ........................................................33

**TABLE OF CONTENTS**
(continued)

C. Pankey Failed to Plead an ERISA Retaliation Claim So His Retaliation Arguments Are Irrelevant ................................................. 35

CONCLUSION .................................................................................................. 36

CERTIFICATE OF COMPLIANCE ................................................................. 37

CERTIFICATE OF SERVICE .......................................................................... 37

**Page(s)**

**Cases**

*Blankenship v. Metro. Life Ins. Co.,*
   644 F.3d 1350 (11th Cir. 2011) .....................................................................19, 20

*Cates v. Reliance Standard Insurance Co.,*
   No. 1:18-CV-543-TCB, 2019 WL 4751860 (N.D. Ga. July 2,
   2019) .............................................................................................................26, 27

*Coates v. Guardian Life Ins. Co. of Am.,*
   No. 8:07-cv-291-T-26TBM, 2009 WL 1043981 (M.D. Fla. Apr.
   16, 2009) ...........................................................................................................24

*Collins v. Life Ins. Co. of N. Am.,*
   No. 6:21-CV-1756-WWB-DCI, 2023 WL 2633309 (M.D. Fla.
   Mar. 24, 2023)....................................................................................................23

*Cromer-Tyler v. Teitel,*
   294 F. App'x 504 (11th Cir. 2008) .....................................................................33

*Ganceres v. Cingular Wireless Health & Welfare Benefits Plan for
   Non-Bargained Emps.,*
   2006 WL 2644919 (M.D. Fla. Sept. 14, 2006)....................................................32

*Gilmour v. Gates, McDonald & Co.,*
   382 F.3d 1312 (11th Cir. 2004) ..........................................................................30

*Hall v. Metro. Life Ins. Co.,*
   2015 WL 5472551 (D. Minn. Sept. 16, 2015)......................................................30

*Harris v. Lincoln Nat'l Life Ins. Co.,*
   42 F.4th 1292 (11th Cir. 2022) ...........................................................................21

*Jackson v. Ft. Dearborn Life Ins. Co.,*
   No. 2:10cv60-MHT, 2010 WL 3880157 (M.D. Ala. Sept. 28,
   2010) .................................................................................................................33

*Jett v. Blue Cross & Blue Shield of Ala.,*
   890 F.2d 1137 (11th Cir. 1989) ..........................................................................21

*Marszalek v. Marszalek & Marszalek Plan*,
   No. 06 C 3558, 2008 WL 2622836 (N.D. Ill. June 30, 2008) ...........................25

*Smyrni v. U.S. Investigations Services LLP*,
   No. C 08-4360 PJH, 2010 WL 807445 (N.D. Cal. Mar. 5, 2010).....................24

*UNUM Life Ins. Co. of Am. v. Narut*,
   363 F. Supp. 2d 1063 (E.D. Wis. 2005) ........................................................24

*\*White v. Coca-Cola Co.*,
   542 F.3d 848 (11th Cir. 2008) ....................................................................28

*Zanny v. Kellogg Co.*,
   2006 WL 1851236 (W.D. Mich. June 30, 2006).............................................27

**Statutes**

29 U.S.C. § 1132(a)(1)(B) ................................................................................13

29 U.S.C. § 1133(1) .........................................................................................32

**Other Authorities**

29 C.F.R. § 2560.503-1(e) ................................................................................32

29 C.F.R. § 2560.503-1(g) .......................................................................29, 30, 32

<u>**STATEMENT OF THE CASE**</u>

**I.     Nature of the Case**

Plaintiff/Appellant, Judson Pankey ("Pankey"), filed this appeal seeking reversal of the District Court's order granting summary judgment for Defendant/Appellee Aetna Life Insurance Company ("Aetna"), denying summary judgment for Pankey, and affirming the claims administrator's decision to terminate Pankey's long-term disability ("LTD") benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").   The District Court determined that the claims administrator, Hartford Life and Accident Insurance Company ("Hartford"),[2] had discretion to terminate Pankey's LTD benefits based upon his failure to provide proof that he satisfied the LTD test of disability set forth in the subject insurance policy, which included an income component—i.e., that Pankey was unable to work in any gainful activity that resulted in an income of more than 60% of his adjusted predisability earnings.  Pankey did not submit the requested proof of income, despite repeated requests.

---

[2] Hartford had purchased from Aetna a block of business that included certain group disability contracts.  Hartford assumed the claim administration for those contracts.

1

## II. Statement of the Facts

### A. Relevant Policy Provisions

Prior to claiming disability, Pankey was employed as a licensed professional engineer for CPH Engineers, Inc. ("CPH"). Doc. 21-1 at 1415, 2334-36. As an employee of CPH, Pankey had LTD coverage through his participation in an employee welfare benefit LTD plan sponsored by CPH ("the Plan"). Doc. 21-2 at 1390-1446.

The Plan was funded through a group disability policy underwritten by Aetna, specifically, Group Policy No. GP-474696-GI (collectively, the Plan and Group Policy No. GP-474696-GI are the "Policy"). Doc. 21-2 at 1390-1446. The Policy is effective as of November 1, 2009. Doc. 21-2 at 1412. At all times material to the termination of benefits at issue in this appeal, Hartford was the claims administrator for the Policy. Doc. 21-2 at 706.

The Policy provides that, for the first twenty-four months following the ninety-day Elimination Period,[3] LTD benefits are payable to a Plan participant who is prevented by illness or injury from performing the material duties of his or her "own occupation," as defined in the Policy, and that continued benefits after that 24-

---

[3] The Elimination Period is "the amount of time [the claimant] must be disabled before benefits start." Doc. 21-2 at 1421.

month period are conditioned on the Plan participant's inability to work in "any reasonable occupation," as defined in the Policy. Doc. 21-2 at 1422 (describing the "Test of Disability" as follows: "From the date that you first became disabled and until monthly benefits are payable for 24 months you meet the test of disability on any day that: You cannot perform the material duties of your own occupation solely because of an illness, injury, or disabling pregnancy-related condition; **and** Your earnings are 80% or less of your adjusted predisability earnings. After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any reasonable occupation solely because of an illness, injury, or disabling pregnancy-related condition"); *see also* Doc. 21-2 at 1413, 1421 (describing Elimination Period applicable under Policy).

The Policy defines "Reasonable Occupation" as "any gainful activity: [f]or which you are, or may reasonably become, fitted by education, training, or experience; **and [w]hich results in, or can be expected to result in, an income of more than 60% of your adjusted predisability earnings**." Doc. 21-2 at 1439 (emphasis added).

The Policy further provides that "Benefits will be paid as soon as the *necessary proof* to support the claim is received. Written proof must be provided for all benefits" ("Payment Provision"). Doc. 21-2 at 1435 (emphasis added).

3

The Policy identifies the conditions under which "Long Term Disability Benefit Eligibility Ends," and states that a covered employee "will no longer be considered as disabled nor eligible for long term monthly benefits when" the recipient "no longer meet[s] the LTD test of disability, as defined by Aetna," or "fail[s] to provide proof that [the covered employee] meet[s] the LTD test of disability" ("Termination Provisions").  Doc. 21-2 at 1423.

The Policy further provides that a covered employee "shall, upon request, submit proof that [the recipient] continues to meet the definition of an eligible group as provided under applicable law or regulation" ("Compliance Provision").  Doc. 21-2 at 1405.

The Policy also states that "**Aetna Requires Proof of Other Income**" and provides that Aetna "may require proof . . . [o]f income you receive from any work for pay or profit," and that if the recipient "do[es] not provide the proof that **Aetna** may require, **Aetna** has the right to suspend or adjust this plan's benefits by the estimated amount of other income benefits" ("Proof of Income Provision").  Doc. 21-2 at 1427-28.

Lastly, the Policy includes a discretionary clause providing that:

> For the purpose of section 503 of Title 1 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), We are a fiduciary with complete authority to review all denied claims for benefits under this Policy. . . . In exercising such fiduciary responsibility, We shall have

4

discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein. We shall be deemed to have properly exercised such authority unless We abuse our discretion by acting arbitrarily and capriciously. We have the right to adopt reasonable policies, procedures, rules, and interpretations of this Policy to promote orderly and efficient administration.

Doc. 21-2 at 1409.

### B. Pankey's LTD Benefits and Termination Thereof

The following facts are relevant to the termination of benefits at issue in this appeal.

Pankey ceased working at CPH in September 2011 due to bilateral sensorineural hearing loss that also affects his speech. Doc. 21-1 at 40, 561. Pankey was approved for LTD benefits by way of correspondence dated December 23, 2011. Doc. 21-1 at 522-23. Pankey received "own-occupation" LTD benefits for the first twenty-four months, Doc. 21-1 at 522-26, 530, and was thereafter approved for "any-occupation" LTD benefits, Doc. 21-1 at 243.

Beginning in June 2021 and continuing until May 2023, Hartford requested repeatedly that Pankey provide various documents required to substantiate his entitlement to disability benefits; Pankey did not cooperate. Among other documents, The Hartford requested copies of Pankey's tax returns to confirm his

income as well as the Schedule K-1 Forms for confirmation of any business earnings. This proof was needed to establish he still satisfied the LTD test of disability, which included an income component—i.e., that Pankey was unable to work in any gainful activity that resulted in an income of more than 60% of his adjusted predisability earnings.

In correspondence dated June 21, 2021 (Doc. 21-1 at 705-15), Hartford requested that Pankey submit various documents as "continuing proof of disability," as required by the Policy. Doc. 21-1 at 705-06. Specifically, Hartford requested that, within sixty days, Pankey submit an Attending Physician's Statement ("APS") completed by his healthcare provider. Doc. 21-1 at 705-06. The APS required his physician to provide information regarding Pankey's condition, diagnoses, treatment plan, and level of functionality, among other information. Doc. 21-1 at 707-08.

In the same correspondence, Hartford also asked Pankey to complete and submit a Claimant Questionnaire. Doc. 21-1 at 705-06, 709-13. The Claimant Questionnaire required Pankey to disclose, among other things, whether he had engaged in any work activity (including self-employment) since the onset of his disability; whether he expected to be engaged in any work activity (including self-employment) in the future, and if so, the expected gross monthly earnings from such work activity; and the income he had received, was currently receiving, was expected to receive, or was eligible to receive. Doc. 21-1 at 710-11.

Lastly, Hartford also requested in this correspondence that Pankey provide copies of his 2020 Tax Returns/Schedule K-1 Form and advised that he was required under the Policy to "[l]et us know of any changes to income you might be receiving or eligible for." Doc. 21-1 at 705-06. Pankey did not respond to Hartford's June 21, 2021 correspondence or provide the requested documents. Doc. 21-1 at 725-26.

In correspondence dated July 26, 2021, Hartford reminded Pankey of his proof-of-loss obligations, and again requested he submit, within sixty days, the completed APS and Claimant Questionnaire, as well as copies of his 2020 tax returns/Schedule K-1 Form. Doc. 21-1 at 716.

Pankey also did not respond to the July 26, 2021 letter or submit the requested documentation. Doc. 21-1 at 735. Nevertheless, Hartford continued to pay Pankey's LTD benefits while it awaited the requested documentation. Doc. 21-1 at 755-57.

In correspondence dated December 9, 2021, Hartford reminded Pankey for the third time of his obligation under the Policy to "[p]eriodically submit continuing proof of your disability," Doc. 21-1 at 735-36, and again requested Pankey submit, within forty-five days, the completed APS and Claimant Questionnaire, as well as copies of his 2020 Tax Returns/Schedule K-1 Form. Doc. 21-1 at 735.

Yet again, Pankey failed to respond or provide the documentation requested in the December 9, 2021 correspondence. Doc. 21-1 at 745. Nevertheless, Pankey

was still paid LTD benefits while Hartford awaited the requested documentation. Doc. 21-1 at 755-57.

On May 2, 2022, Hartford sent yet another letter to Pankey (Doc. 21-1 at 745-55), this time expressly advising that, "to avoid having your benefits terminated," he was required to provide the documentation requested repeatedly in the three prior letters as soon as possible. Doc. 21-1 at 746.

The May 2, 2022 letter once again requested that Pankey submit the completed APS and Claimant Questionnaire, his 2020 Tax Returns/Schedule K-1 Form, and also requested his 2021 Tax Returns/Schedule K-1 Form, "for confirmation of any business earnings for 2020-2021." Doc. 21-1 at 746.

Pankey did not provide the documentation requested in the May 2, 2022 letter. Doc. 21-1 at 755-56. Still, Pankey continued to receive LTD benefits while Hartford awaited the requested documentation. Doc. 21-1 at 755-57.

In correspondence dated July 15, 2022, Hartford notified Pankey that his LTD benefits had been terminated due to his failure to provide a completed APS and Claimant Questionnaire and 2020/2021 tax returns, despite repeated requests for such documents over the prior year. Doc. 21-1 at 755-57.

In the July 15, 2022 letter, Hartford explained that "[o]ur decision to deny your claim is based on the fact that we didn't have enough proof of loss to evaluate

your disability." Doc. 21-1 at 756. The July 15, 2022 letter additionally noted that: "The Analyst should recommend a claim be terminated or denied when:

- Information was requested from a physician or claimant;
- Ongoing disability cannot be determined without the requested information;
- The claimant is aware of what information is needed; and
- The information has not been received after at least two (2) follow ups."

Doc. 21-1 at 756-57.

Nevertheless, Hartford gave Pankey another opportunity to submit the requested documentation, stating: "If you have additional information that you believe may change our decision, please submit the required information to my attention. Specifically, you should send a completed [APS], completed Claimant Questionnaire, and tax returns/Schedule K1 forms from 2020 & 2021. If you would like this information considered, we must receive it as soon as possible, but no later than 180 days from the date of this letter." Doc. 21-1 at 756.

In January 2023, Pankey appealed the termination of his LTD benefits. Doc. 21-1 at 759. During the appeal, Pankey provided the following documents to Hartford: (1) a January 4, 2023 letter from his treating audiologist confirming that Pankey remained under her care; (2) an outdated Claimant Questionnaire dated February 19, 2018; (3) a Schedule K-1 Form from 2019 (which had already been received by Hartford on September 23, 2020); (4) a Social Security Administration

9

statement dated January 4, 2023; (5) an outdated Other Income Questionnaire dated May 16, 2016; (6) a record indicating that Pankey had been awarded Social Security benefits as of May 1, 2012; and (7) a copy of the LTD claim file.  Doc. 21-1 at 762, 792.

Pankey failed to provide an updated Claimant Questionnaire or the 2020 or 2021 tax returns and Schedule K-1s, so those documents were again requested in correspondence from Hartford appeals specialist dated February 3, 2023 and February 20, 2023.  Doc. 21-1 at 762, 775-76.  Pankey did not provide the requested documents in response to the February 3, 2023 or February 20, 2023 requests.  Doc. 21-1 at 775-76, 792. As a result, the termination of his LTD benefits was upheld on appeal, and Pankey was advised of such by correspondence dated March 8, 2023. Doc. 21-1 at 792-94.

At no time from Hartford's initial June 21, 2021 letter requesting the proof-of-loss documents for the relevant time periods, through the May 8, 2023 letter upholding the benefits-termination decision on appeal, did Pankey write to Hartford to express any concern about the confidentiality of his tax returns or any other reason why he could not provide the requested documents.

### C.    Pankey's History of Refusing to Provide Requested Documentation

Pankey has a long history of refusing to provide proof-of-loss documentation, thereby inhibiting the claims administrator's ability to verify his continuing

disability. For instance, between July 2014 and May 2015, Pankey refused to comply with eight separate requests for his 2011 to 2013 tax returns, resulting in the termination of his LTD benefits in June 2015. Doc. 21-1 at 553-63.[4] In February 2015, Aetna had explained that "information in your claim file indicates that you may be receiving **work earnings** related to a business called 'Brown Little Development [BLD]'" and "[a]s a result, it is unclear whether you are currently engaged in any activity which would result in, or can be expected to result in, an income of more than 60% of your pre-disability earnings." Doc. 21-1 at 557 (emphasis added). In March 2015, Pankey replied that BLD was a passive real estate investment that had purportedly reported losses for 2011 through 2014, but he failed to provide any documentation to support such statements. Doc. 21-2 at 830. Pankey's LTD benefits were reinstated in January 2016, after Pankey finally submitted tax returns for BLD. Doc. 21-1 at 557, 565-66, 570.

Starting in April 2016, Pankey failed to respond to requests for his 2015 tax returns and other proof-of-loss documentation. Doc. 21-1 at 572-73, 576, 580, 584, 588, 590-91, 593-95. In August 2016, Pankey sent certain of the requested documents (such as the APS dated April 27, 2016, and an Other Income

_____

[4] Aetna sent these requests on July 1, 2014, August 8, 2014, October 27, 2014, December 1, 2014, December 18, 2014, February 24, 2015, April 27, 2015, and May 15, 2015. *Id.*

11

Questionnaire dated April 27, 2016), but failed to provide the requested 2015 tax returns. Doc. 21-1 at 591. In February 2017, Pankey sent SSA earnings records for 2014 and 2015, but did not provide the requested tax returns. Doc. 21-1 at 1023-24, 1032-35.

In May 2018, Pankey's LTD benefits were terminated yet again for failure to submit proof-of-loss documentation (an LTD Employee Questionnaire, which included questions about his income), despite repeated requests for same. Doc. 21-1 at 597, 599, 601-05. Pankey's benefits were reinstated in August 2018, after he finally submitted the requested document. Doc. 21-1 at 606.

And in January 2019, Pankey's LTD benefits were terminated yet another time for failure to submit requested medical records. Doc. 21-1 at 656. His benefits were reinstated in February 2019 after he submitted the requested records. Doc. 21-1 at 659-60.

In April 2019, Aetna requested Pankey's 2016-2018 **business** tax returns, his most recent Social Security Disability Cost of Living Adjustment letter, and a completed Other Income Questionnaire. Doc. 21-1 at 681-82. Pankey responded with the requested documents. Doc. 21-2 at 1368-77.

In May 2020, the claims administrator Hartford requested Pankey's 2019 tax return to confirm "**business** income," and in September 2020, Hartford followed up on that request and asked for a copy of his 2019 Schedule K-1. Doc. 21-1 at 686-

95, 715-16.  In September 2020, Pankey responded by providing the 2019 K-1 Schedule for BLD.  Doc. 21-1 at 1085. 1087.

### III.  Course of Proceedings Below

#### A.  Relevant Pleadings and Summary-Judgment Motions

Pankey brought suit pursuant to 29 U.S.C. § 1132(a)(1)(B), challenging the decision to terminate payment of his LTD benefits.  Doc. 1.  Aetna filed its Answer and Affirmative Defenses to the Complaint.  Doc. 16.

Pankey and Aetna filed competing Motions for Summary Judgment.  Doc. 22, 24.  In his motion, Pankey argued that the decision to terminate his LTD benefits was both wrong and arbitrary and capricious.  Doc. 22 at 14.  Pankey contended that Aetna had not shown that the Policy required him to provide either his personal tax returns or K-1 Schedules from BLD.  Doc. 22 at 16-23.  He also argued that the Policy did not allow the termination of benefits for failure to provide requested financial information.  Doc. 22 at 23-25.

In its competing Motion for Summary Judgment, Aetna argued that it acted reasonably in terminating Pankey's LTD benefits.  *See generally* Doc. 24.

The parties then filed Responses in opposition to the other's Motion for Summary Judgment, Doc. 25, 26, and thereafter submitted Replies in support of their respective Motions for Summary Judgment.  Doc. 27, 28.

**B. The Magistrate Judge's Report and Recommendation**

A Report and Recommendation ("R&R") was issued by the Magistrate Judge to whom the Motions for Summary Judgment were referred, recommending that Pankey's Motion for Summary Judgment be granted and that Aetna's Motion for Summary Judgment be denied. Doc. 29. In the R&R, the Magistrate Judge reasoned that Hartford acted arbitrarily in terminating benefits based on Pankey's failure to submit tax returns because its decision was inconsistent with its past handling of Pankey's claim, and therefore unreasonable. Doc. 29 at 18. The R&R further concluded that, at most, Aetna had the right to suspend or adjust the LTD benefits, but not terminate them, under the circumstances. Doc. 29 at 16-17. The R&R further recommended the District Court conclude that Pankey had satisfied his proof-of-loss obligations by submitting *some* proof that he made no earnings (i.e., the SSA earnings records), even if Hartford did not deem the documentation that he submitted to be *sufficient* proof of loss. Doc. 29 at 15.

Aetna filed an Objection to the R&R. Doc. 31. In the Objection, Aetna contended that the R&R was flawed based on several grounds: (1) It did not address Pankey's failure to submit Schedule K-1s or the updated Claimant Questionnaire, but instead focused solely on Pankey's failure to submit tax returns; (2) It did not give effect to all provisions of the Policy or construe all provisions together as a whole in finding Hartford lacked discretion to determine the type of proof of loss it

14

deemed sufficient to establish Pankey's continued disability; (3) It failed to give the required deference to Hartford's decision to terminate benefits; and (4) It incorrectly stated that Hartford had never terminated Pankey's benefits in the past for failure to provide tax returns.  Doc. 31 at 3-10.

Pankey filed a Response in opposition to Aetna's Objection to the R&R, insisting the R&R had correctly concluded that the decision to terminate benefits was arbitrary and capricious.  Doc. 32.

### C.    The District Court's Order and Judgment

The District Court entered an Order sustaining Aetna's various objections to the R&R, granting Aetna's Motion for Summary Judgment, and denying Pankey's Motion for Summary Judgment.  Doc. 33.  The District Court first agreed with Aetna's argument that the R&R misconstrued the terms of the Policy by failing to read relevant provisions as part of a whole.  Doc. 33 at 2-3.  The District Court reasoned that the Termination Provisions, Proof of Income Provision, Compliance Provision, and Payment Provision of the Policy when "read together and giving the fullest effect to each individually and in context, clearly afford Defendant discretion to reasonably determine whether Plaintiff had submitted sufficient proof to avoid termination."  Doc. 33 at 3-4.  Although the Proof of Income Provision and the Payment Provision expressly refer to "necessary proof" or "proof that Aetna may require," and the Termination Provision does not use such language, that fact was

not dispositive.  Doc. 33 at 4-5.  The District Court explained that "[b]ecause Aetna has discretion to determine its own LTD test of disability, it necessarily follows that it must also have discretion to evaluate the sufficiency of proof that Plaintiff meets that test," and that "[t]o conclude otherwise would nullify Aetna's express discretion to determine the LTD test of disability, an illogical and impermissible outcome."  Doc. 33 at 4-5.

Next, the District Court concluded that it was reasonable for Aetna to interpret the Policy to allow for termination of benefits based on Pankey's failure to submit sufficient proof of loss.  Doc. 33 at 6.  The District Court noted that the Compliance Provision required Pankey to, "upon request, submit proof that [he] continues to meet the definition of an eligible group as provided under applicable law or regulation."  Doc. 33 at 6.  The District Court further noted that the Policy's "use of the word proof resembles the provision dictating that Plaintiff 'will no longer be considered as disabled nor eligible for long term monthly benefits' on the day Pankey 'fails to provide proof that [he] meet[s] the LTD test of disability.'"  Doc. 33 at 6.

The District Court concluded that because these provisions mirror each other, Aetna could have reasonably construed the use of the term "proof" to mean the proof sought "upon request" rather than any proof provided or deemed sufficient by Pankey.  Doc. 33 at 6.  That interpretation also fell within Aetna's discretionary

16

"right to adopt reasonable policies, procedures, rules, and interpretations" of the Policy "to promote orderly and efficient administration," as stated in the Policy's Discretionary Clause, and with Aetna's discretion to determine its own LTD test of disability. Doc. 33 at 6. Left without the requested proof, Aetna's decision to terminate benefits was reasonable, and Aetna's interpretation is also reasonable and is entitled to deference. Doc. 33 at 7.

Lastly, the District Court concluded that the record belied the R&R's conclusion that Aetna had never previously terminated Pankey's LTD benefits for failure to submit tax returns. Doc. 33 at 8-9. Disagreeing with the R&R's conclusion that Aetna had for years determined benefits were payable based on Pankey's provision of Schedule K-1 forms for BLD and that it "is unclear . . . why the termination at issue in this case was different," the District Court explained:

> Because the Plan's terms vest Aetna with the 'discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms, Aetna could have deliberately construed the terms of its plan in a light favorable to Plaintiff and allowed the K-1 forms as a substitute. But it is undisputed that Plaintiff did not provide updated K-1 forms in this case as he had done in the past. At a minimum, this change in circumstance weighs against a finding that Defendant abused its discretion in terminating Plaintiff's LTD benefits due to an inconsistent construction of the Plan.

17

Doc. 33 at 9. Accordingly, the District Court sustained Aetna's Objection on that point as well. Doc. 33 at 9.

The District Court next turned to the parties' respective Motions for Summary Judgment. Doc. 33 at 9-12. The District Court first ruled that it would not consider Plaintiff's arguments related to purported ERISA retaliation because Pankey failed to plead such a claim in his Complaint. Doc. 33 at 9-10.

The District Court then turned to whether the decision to terminate Pankey's LTD benefits was arbitrary and capricious. Doc. 33 at 10. The District Court rejected Pankey's argument that Aetna lacked authority to require tax returns related to Pankey's passive real estate investment with BLD. Doc. 33 at 11-12. The District Court noted that Pankey's argument was based on his interpretation of the word "work", as used in the LTD test of disability, to exclude his ability to earn money from investments that are passive in nature. Doc. 33 at 11. The District Court noted that the Policy did not define the term "work" and that Aetna had the right to adopt reasonable policies, procedures, rules and interpretations of the Policy, per the Policy's discretionary clause. Doc. 33 at 11. Yet, Pankey insisted the District Court defer to his judgment and interpretation of the Policy over Aetna's – but that is not the law. Doc. 33 at 11-12. Thus, Pankey failed to meet his burden of proving that Aetna's decision to terminate his LTD benefits was arbitrary. Doc. 33 at 12.

The District Court further ruled that Pankey failed to meet his burden of demonstrating that a conflict of interest, created by Aetna's authority to approve and pay benefits, tainted its decision to terminate benefits. Doc. 33 at 10-11 n.4. The District Court also refused to consider Pankey's argument that the Plan does not support the termination of his benefits if the financial information required by Aetna was sought to determine benefit offsets. Doc. 33 at 11 n.11. The District Court explained that the parties had agreed that Aetna terminated Pankey's benefits pursuant to the requirement that he submit proof that he meets the LTD test of disability. *Id.*

The District Court therefore denied Pankey's Motion for Summary Judgment and granted Aetna's Motion for Summary Judgment. Doc. 33 at 13.

The District Court thereafter entered Judgment in Aetna's favor. Doc. 34. This appeal followed. Doc. 36.

## IV. Standard of Review

This Court "review[s] *de novo* a district court's ruling affirming or reversing a plan administrator's ERISA benefits decision, applying the same legal standards that governed the district court's decision. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011)

When "reviewing a plan administrator's benefits decision" this Court conducts the following six-step analysis:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355.

Because the Policy here includes a discretionary clause, Pankey was required to demonstrate the decision to terminate his LTD benefits was arbitrary and capricious, which Pankey concedes. *Blankenship*, 644 F.3d at 1355-56; Initial Br. at 20. "When conducting a review of an ERISA benefits denial under an arbitrary

and capricious standard . . . the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir. 1989). The Court limits its review to the Administrative Record when conducting a review of an ERISA benefits denial under an arbitrary and capricious standard. *Harris v. Lincoln Nat'l Life Ins. Co.*, 42 F.4th 1292, 1296 (11th Cir. 2022) (quoting *Jett*, 890 F.2d at 1139).

## SUMMARY OF THE ARGUMENT

Pankey has not met his burden of showing error in the District Court's decision finding that Hartford did not act arbitrarily in denying his LTD benefits.

The Administrative Record conclusively establishes that Hartford had discretion to terminate Pankey's LTD benefits based upon his failure to provide proof that he satisfied the LTD test of disability set forth in the subject policy. The applicable LTD test of disability required proof that Pankey was unable to perform any gainful activity which resulted in an income of more than 60% of his adjusted predisability earnings. Yet Pankey ignored seven requests, made over the course of nearly two years, to submit his updated Claimant Questionnaire, tax returns and Schedule K-1s as proof of continuing eligibility for LTD benefits. Hartford had a right to interpret terms within the Policy and to decide which documents it deemed necessary to show Pankey's income.

Because Pankey failed to provide the requested proof demonstrating that he met the LTD test of disability, he was no longer eligible for LTD benefits under the language of the subject policy. Consequently, his LTD benefits were properly terminated, and the Court should affirm the judgment entered in Aetna's favor.

**ARGUMENT**

**I.     Hartford Acted Within Its Discretion in Terminating Benefits Based Upon Pankey's Failure to Provide the Requested Financial Proof-of-Loss Documentation**

The District Court correctly determined that Pankey failed to meet his burden of showing that the decision to terminate his LTD benefits was arbitrary and capricious. The Administrative Record does, in fact, reflect a reasonable basis for the decision.

Pankey had been receiving LTD benefits for more than 24 months, so under the Policy, he was deemed disabled "on any day [he is] unable to work at any reasonable occupation solely because of an illness, injury, or disabling pregnancy-related condition." Doc. 21-2 at 1422. "Reasonable occupation" was, in turn, defined to include an income component—specifically, Pankey must show he was unable to work in any gainful activity which resulted in an income of more than 60% of his adjusted predisability earnings. Doc. 21-2 at 1439. Thus, as proof of continuing disability under the "any reasonable occupation" test, Pankey was required to submit proof of income. *Id.* The Policy allowed the termination of

22

benefits as of the date Pankey failed to provide proof that he met the financial component of the LTD test of disability. Doc. 21-2 at 1423. The Policy further provides that "Benefits will be paid as soon as the **necessary proof** to support the claim is received." Doc. 21-2 at 1435 (emphasis added).

The claims administrator was vested with discretion to interpret these provisions and thus to determine the type of proof it deemed necessary to verify income. *Cf. Collins v. Life Ins. Co. of N. Am.*, No. 6:21-CV-1756-WWB-DCI, 2023 WL 2633309, at *6 (M.D. Fla. Mar. 24, 2023) ("Language that a claimant must produce proof of loss that is 'satisfactory' to the insurer has been found by the Eleventh Circuit to suffice as a grant of discretionary authority.") (collecting cases).

It is undisputed that Pankey failed to provide the updated Claimant Questionnaire, which required Pankey to disclose whether he had engaged in any work activity (including self-employment) since his disability's onset; whether he expected to be engaged in any work activity (including self-employment) in the future, and if so, the expected gross monthly earnings from such work activity; and the income he had received, was currently receiving, was expected to receive, or was eligible to receive. Rather, as part of the claim appeal, he merely provided an *outdated* Claimant Questionnaire from 2019, years earlier. Pankey does not argue in this appeal that the claims administrator was not permitted to request such Claimant Questionnaire.

23

Nor did he provide the requested tax documentation proving that, in 2020 and 2021, he had not engaged in any gainful activity that resulted in, or could be expected to result in, an income of more than 60% of his adjusted predisability earnings, despite repeated requests over nearly two years. Given Pankey's failure to submit continuing proof of loss, the decision to terminate his benefits had a reasonable basis and was not arbitrary. *Cf. Coates v. Guardian Life Ins. Co. of Am.*, No. 8:07-cv-291-T-26TBM, 2009 WL 1043981, at *4 (M.D. Fla. Apr. 16, 2009) (granting summary judgment for defendant on ERISA claim challenging denial of LTD benefits, where plaintiff had not provided sufficient financial proof of disability, specifically, requested tax returns); *UNUM Life Ins. Co. of Am. v. Narut*, 363 F. Supp. 2d 1063, 1068-69 (E.D. Wis. 2005) (granting summary judgment for defendant, and concluding that claims administrator had power under the Plan to demand production of personal and business federal and state tax returns); *Smyrni v. U.S. Investigations Services LLP*, No. C 08-4360 PJH, 2010 WL 807445, at *5–6 (N.D. Cal. Mar. 5, 2010) (claimant was required to provide tax returns where policy provided that "[f]ailure of a claimant to cooperate with the Insurance Company in the administration of the claim may result in termination of the claim. Such cooperation includes ... providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due"; also rejecting argument that claimant should not be required to provide tax returns

because he files returns jointly with his spouse); *Marszalek v. Marszalek & Marszalek Plan*, No. 06 C 3558, 2008 WL 2622836, at *13 (N.D. Ill. June 30, 2008) (affirming benefits-termination decision due to claimant's failure to submit requested tax returns and updated answers to medical questionnaire, where policy notified Plan participants of their "obligation to submit, at their own expense, 'completed claim statements ... and any other items [Northwestern Mutual] may reasonably require' in support of a claim" and "further notifies participants that failure to provide requested documentation within 60 days may result in the denial of a claim").

The District Court correctly concluded that Pankey misconstrued the terms of the Policy by failing to read relevant provisions as part of a whole. Doc. 33 at 2-3. Specifically, when the Termination Provisions, Proof of Income Provision, Compliance Provision, and Payment Provision of the Policy are read together and in context, they clearly afford the claims administrator discretion in determining whether Pankey had submitted sufficient proof to avoid termination. Doc. 33 at 3-4. As the District Court correctly reasoned, "[b]ecause Aetna has discretion to determine its own LTD test of disability, it necessarily follows that it must also have discretion to evaluate the sufficiency of proof that Plaintiff meets that test," and that "[t]o conclude otherwise would nullify Aetna's express discretion to determine the LTD test of disability, an illogical and impermissible outcome." Doc. 33 at 4-5.

25

And as the District Court also correctly concluded, under the discretionary clause's right to adopt reasonable interpretations of the Policy, the administrator could have reasonably construed the use of the term "proof" to mean the proof sought "upon request" rather than any proof provided or deemed sufficient by Pankey. Doc. 33 at 6.

Nevertheless, to support his argument that Hartford lacked authority to request his tax returns, Pankey cites *Cates v. Reliance Standard Insurance Co.*, No. 1:18-CV-543-TCB, 2019 WL 4751860 (N.D. Ga. July 2, 2019). Pankey's reliance on *Cates* is misplaced, as it is factually distinguishable in significant ways. First, *Cates* did not involve a benefits-termination decision based on the failure to provide proof-of-loss documentation; instead, it involved a reduction in benefits pursuant to a Rehabilitation Benefit ("RB") provision or an Other Income Benefits ("OIB") provision that allowed the insurer to offset certain wages the employee earned against his LTD benefits. *Id.* at *2-3. However, the insurer ultimately conceded during the litigation that the OIB provision was inapplicable. *Id.* at *6. The insurer had also "previously stated that the RB provision did not apply to [the claimant]," and the Court agreed the provision was inapplicable for the additional reason that it required supervision by a physician or a licensed or certified rehabilitation specialist, and the claimant had never been under any such supervision. *Id.* at *7.

26

Under those circumstances, the *Cates* court concluded the insurer had no reasonable basis for reducing his benefits. And, importantly, in *Cates*, the insurer's own claims notes recognized that "[t]he policy does not contain language supporting closure of the claim for non-receipt of documentation relating to the offset of Other Income Benefits." *Id.* at *3. This admission suggests the insurer took action that it recognized was impermissible under the plan. The facts and reasoning in *Cates* are inapplicable to the Administrative Record here, and the issues in this appeal.

Pankey's reliance on *Zanny v. Kellogg Co.*, 2006 WL 1851236 (W.D. Mich. June 30, 2006), is likewise misplaced because here, Hartford did not limit its requests to documents evidencing passive income alone.

Pankey insists that Hartford should have simply accepted his SSA earnings record as proof of his income, rather than requesting his tax returns. Initial Br. at 33, 42. But this argument ignores Hartford's discretion in deciding how to construe the LTD Plan's terms, and Pankey has cited no authority to support his position that he should have been granted sole authority to decide which documents were relevant to Hartford's analysis.

Pankey's argument that Hartford lacked authority to request documents pertaining to what he refers to as "passive income" such as BLD fails for a few reasons. First, as the District Court correctly concluded, the Policy does not define the term "work", and the claims administrator had discretion to adopt reasonable

27

interpretations of that term as it is used in the Policy. Doc. 21-2 at 1409. It does not provide Pankey the right to do so. And "the arbitrary and capricious standard of review would have little meaning if ambiguous language in an ERISA plan were construed against the [plan administrator]." *White v. Coca-Cola Co.*, 542 F.3d 848, 857 (11th Cir. 2008) (quoting *Cagle*, 112 F.3d at 1519). The policy implications would be far-reaching if the Court were to decide that claimants such as Pankey had a right to refuse to provide requested documents based on their own interpretation of the Policy—rather than giving deference to reasonable interpretations by the claims administrator.

Plaintiff's argument ignores that, even if BLD had been a passive investment in the past, Hartford had a right to request current documentation confirming the status of Pankey's relationship with BLD and whether the nature of his relationship with that partnership had evolved over the years such that he was now earning nonpassive income from BLD.[5] Furthermore, Pankey's refusal to share his personal

---

[5] The Internal Revenue Service's website explains that "The partnership uses Schedule K-1 to report your share of the partnership's income, deductions, credits, etc.… Although the partnership generally isn't subject to income tax, you may be liable for tax on your share of the partnership income, whether or not distributed. Include your share on your tax return if a return is required." IRS website, *Partner's Instructions for Schedule K-1 (Form 1065)* (2024), *available at https://www.irs.gov/instructions/i1065sk1* (last visited Nov. 3, 2025). The IRS further explains that income from a partnership can be either passive or nonpassive. *Id.* "Income (loss), deductions, and credits from an activity are nonpassive if you

tax returns and an updated Claimant Questionnaire raised red flags and failed to meet requirements under the Policy to provide proof that he met the LTD test of disability, specifically the income component.

## II.     None of Pankey's Other Arguments on Appeal Have Merit

### A.     The Termination Letter Clearly Communicated the Reason for Termination of Pankey's LTD Benefits

Pankey contends that this case "centers on . . . the contents of Aetna's July 15, 2022 termination and the extent i[t] complied with the requirements of the applicable ERISA regulations and the LTD Plan terms." Initial Br. at 17. He argues the "termination letter violates applicable ERISA regulations by not specifically explaining why benefits were terminated." *Id.*

Pankey begins the substantive portion of his Argument section by discussing 29 C.F.R. § 2560.503-1(g)(1)(i) and (ii), which requires that the termination letter set forth the specific reasons for the denial and be written in a manner calculated to be understood by the claimant. Initial Br. at 24-25.

Pankey raised this issue for the first time in his Motion for Summary Judgment. Doc. 22 at 16-17. To the extent Pankey is suggesting there was a

---

determine that: You materially participated in a trade or business activity of the partnership, or You were a real estate professional (defined earlier) in a rental real estate activity of the partnership." *Id.*

violation of those regulations, the Complaint does not allege such a violation. Doc. 1. Thus, the issue was not properly before the District Court on summary judgment. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (refusing to consider new claim raised in summary-judgment response, and explaining that "[l]iberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint").[6]

In any event, Pankey's suggestion that the termination letter failed to comply with the regulations lacks merit. First, Pankey suggests the termination letter did not comply with 29 C.F.R. § 2560.503-1(g)(1)(i) and (ii) in that it "confusingly" did not cite the LTD Plan provisions allowing an offset of work earnings against benefits. Initial Br. at 24-25. Pankey's suggestion raises a red herring because that omission was intentional. As explained in the letter, Pankey's benefits were terminated based on his failure to submit the requested proof-of-loss documentation, which was needed to confirm he continued to meet the LTD test of disability. The

---

[6] Further, "[g]enerally, the remedy for a violation of § 1133 is remand," *Hall v. Metro. Life Ins. Co.*, 2015 WL 5472551, at *14 (D. Minn. Sept. 16, 2015), but here, the Complaint does not seek remand but instead seeks "payment of disability benefits" and "reinstatement of benefits," Doc. 1 at 4.

income information was not requested solely for purposes of determining offsets. Thus, there was no need to cite the offset provision in the termination letter.

Pankey also asserts the termination letter was confusing because "the only information Aetna clearly wanted (and which was not contradicted by other language in the termination letter) was proof that Pankey remained under the regular care of a physician." Initial Br. at 25-26. This is inaccurate. Before terminating benefits, Hartford made four requests for the tax documents, and another two requests for such documentation in the July 15, 2022 termination letter. Doc. 21-1 at 705, 716, 735, 746, 755-57. The documents were requested two more times while his appeal was pending. Doc. 21-1 at 762, 775-76. Hartford clearly requested and wanted proof of income to verify his continuing disability.

Pankey next contends there was confusion, and that Hartford's request for financial documents to determine whether Pankey met the LTD test of disability was "unreasonable", because the termination letter stated: "This is not a decision about whether you are disabled." Initial Br. at 25-27. Pankey takes this language out of context in suggesting it meant that Hartford had decided that he had, in fact, met the LTD test of disability. When the entire letter is read in context, it is clear that this language was intended to communicate that Hartford did not question whether Pankey was *physically* disabled, but that further proof was needed to establish he still satisfied the LTD test of disability, which included an income component—i.e.,

that Pankey was unable to work in any gainful activity that resulted in an income of more than 60% of his adjusted predisability earnings. Pankey did not submit the requested proof of income, despite repeated requests. By refusing to submit the requested documents, Pankey prevented Hartford from determining whether he still met the income component of the LTD test of disability.

The letter complied with the regulations—it explained the benefits were terminated "because we never received information that we'd requested from you," including the "2020 and 2021 Tax Returns/Schedule K-1 Form for confirmation of any business earnings for 2020-2021." Doc. 21-1 at 755. The letter outlined the LTD test of disability and the conditions under which benefits would end, and noted that Plaintiff must "regularly submit proof of loss." Doc. 21-1 at 756. The letter also explained that "[o]ur decision…is based on the fact that we didn't have enough proof of loss to evaluate your disability." *Id.* The letter also outlined the "guidelines…relied upon in making this determination," and notified Pankey of his right to appeal and to file suit under ERISA. Doc. 21-1 at 756-57. *Cf. Ganceres v. Cingular Wireless Health & Welfare Benefits Plan for Non-Bargained Emps.*, 2006 WL 2644919, at *9 (M.D. Fla. Sept. 14, 2006) (claims administrator "complied with 29 U.S.C. § 1133(1) and 29 C.F.R. § 2560.503-1(e)-(g)" where termination letter explained plaintiff had not submitted evidence to support disability, "set forth the definition of 'Total Disability' under the Plan, thus informing [plaintiff] that the

32

medical information she provided did not support a finding that her malady fell within that definition," and "explained [plaintiff's] right to appeal, informed her how to do so and explained that if her appeal was denied, she could file suit under ERISA").

Pankey fails to provide any support for his alternative request for a remand. Initial Br. at 26-27 and n.11. Pankey's reliance on *Jackson v. Ft. Dearborn Life Ins. Co.*, No. 2:10cv60-MHT, 2010 WL 3880157 (M.D. Ala. Sept. 28, 2010), is misplaced because it involved an exhaustion-of-administrative-remedies issue, including whether the termination letter made clear that the plaintiff's prior appeal "did not count for purposes of meeting the prerequisite [to appeal before filing] an ERISA claim[.]" *Id.* at *2. *Cromer-Tyler v. Teitel*, 294 F. App'x 504 (11th Cir. 2008), is likewise inapposite because, unlike here, there the letter did not give a specific reason for the determination and did not specify a provision of the policy on which the determination was based. *Id.* at 508.

**B. Pankey Never Raised Any Concerns Over Confidentiality from 2021 to 2024, the Timeframe at Issue in the Benefits-Termination at Issue on Appeal**

Next, Plaintiff suggests he had a legitimate basis for refusing to produce the requested financial records, in light of his concerns over their confidentiality. Initial

Br. at 22-23.[7] Pankey expressed his concerns over confidentiality of completely different documents in November 2014, nearly seven years before the first document request at issue in June 2021. And the Administrative Record does not include any letters from Pankey to Hartford expressing confidentiality concerns from June 2021 through the date of the conclusion of his appeal in 2023.

Pankey fails to mention that Aetna's February 24, 2015 letter also addressed his confidentiality concerns, stating: "In response to your concerns relative to the privacy of your claim file information, please be advised that Aetna commits to complete confidentiality with regards to our member's protected health and claim file information. No financial or other protected health information can be released from your claim file, to you or any third party, without appropriate written authorization and barring your claim meets all other criteria for the appropriate release of file documentation." Doc. 21-2 at 557-58.

---

[7] This argument is likewise unavailing because it was Aetna that previously inadvertently disclosed his personal information, yet it was Hartford that sought the documentation at issue from 2021 to 2023. Doc. 21-2 at 1019. The Administrative Record does not reflect any prior inadvertent disclosure of Pankey's information *by Hartford*.

**C.** **Pankey Failed to Plead an ERISA Retaliation Claim So His Retaliation Arguments Are Irrelevant**

Pankey also dedicates a portion of his Initial Brief to describing the "contentious" relationship between him and Aetna, and various legal claims and administrative actions he had initiated against Aetna over the years. *See, e.g.*, Initial Br. at 8-9, 21-22. He also notes his belief that Aetna repeatedly terminated his benefits "in retaliation" for the various complaints he filed. Initial Br. at 22. At the same time, Pankey concedes he did not bring any claim for ERISA retaliation in this action, which should end any inquiry on appeal regarding the issue. Despite this admission, Pankey states, without support, that his failure to plead a claim for retaliation "does not mean that Pankey's state of mind and the course of dealing between Pankey and Aetna is irrelevant in examining the propriety of Aetna's termination decision." Initial Br. at 22 n.6. Not only does Pankey fail to factually support his position that the purported contentious relationship impacted Hartford's decision to terminate benefits or its expectation that Pankey adhere to proof-of-loss requirements, but he also cites no caselaw to support his contention that Pankey's state of mind is relevant in reviewing Hartford's claim decision, and the Court should reject it.

# **CONCLUSION**

For the foregoing reasons, Aetna respectfully requests that the Court affirm the Judgment entered below.

Date: November 3, 2025

Respectfully submitted,

*By: /s/ Jonathan M. Fordin*
Jonathan M. Fordin, Esq.
Fla. Bar No. 371637
jfordin@shutts.com
morozco@shutts.com
**Shutts & Bowen LLP**
200 South Biscayne Blvd., Suite 4100
Miami, Florida 33131
Telephone: (305) 347-7390

-and-

*/s/ Amy Wessel Jones*
Amy Wessel Jones, Esq.
Fla. Bar No. 93837
AJones@shutts.com
JGoodwin@shutts.com
**Shutts & Bowen LLP**
201 East Las Olas Boulevard, Suite 2200
Ft. Lauderdale, FL 33301
Telephone: (954) 524-5505

*Attorneys for Appellee Aetna Life Insurance Co.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this document contains 8,163 words.

This document also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font, a proportionally spaced typeface.

*/s/ Amy Wessel Jones*
AMY WESSEL JONES

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of November 2025, a true and correct copy of the foregoing has been furnished via U.S. mail to **Gregory D. Swartwood, Esquire**, The Nation Law Firm, LLP, 570 Crown Oak Centre Drive, Longwood, FL 32750, gswartwood@nationlaw.com.

*/s/ Amy Wessel Jones*
AMY WESSEL JONES

MIADOCS 30643844 10 24022.1033